[No. 29779. Department Two. April 5, 1946.]

DONALD W. LYLE et al., *Respondents*, v. HAROLD L. HASKINS et al., *Defendants*, HENRY O. JOHNSON et al., *Appellants*.[1]

[1]Reported in 168 P. (2d) 797.

884

*Bertil E. Johnson* (*Ralph M. Rogers,* of counsel), for appellants.

*C. D. Cunningham,* for respondents.

JEFFERS, J.—On October 6, 1944, Donald W. Lyle and Karl Nelson, copartners, instituted an action in the superior court for Lewis county against Harold L. Haskins, personally, and Harold L. Haskins and E. Roberta Haskins, his wife, as a community, and Henry O. Johnson, personally, and Henry O. Johnson and Jane Doe Johnson, his wife, as a community.

It is alleged in the complaint that, on or about May 18, 1943, defendants Harold L. Haskins and wife, who had theretofore been operating a sawmill and lumber manufacturing business in Morton, Lewis county, Washington, sold and delivered to Karl Nelson, one of the plaintiffs above named, for the use and benefit of Donald W. Lyle and Karl Nelson, the good will of such business and certain real estate described in the complaint, together with the lumber yard, mill, dry kilns, and other buildings situated thereon, and all machinery and equipment in the sawmill and dry kiln, upon a conditional sales contract, for the total purchase price of $52,500.

It is further alleged that, on the same date, a supplemental

agreement in writing was entered into between Harold L. Haskins and wife and Karl Nelson, for the use and benefit of Karl Nelson and Donald W. Lyle, wherein it was agreed:

"That the sellers agree that upon the completion of the sale as contemplated in the principal agreement, whereby the buyer purchases the retail lumber yard, sawmill and equipment of the sellers, located in the town of Morton, Lewis county, Washington, that in consideration of the moneys paid and to be paid, as therein stated, the sellers agree to refrain from entering into or engaging *directly or indirectly* in lumber manufacturing or selling in competition with the buyer within the county of Lewis, state of Washington, for a period of ten (10) years." (Italics ours.)

It is further alleged that thereafter plaintiffs complied with each and every of the terms of the contract and supplemental contract, and paid defendants Harold L. Haskins and wife the full purchase price as called for in the contract, and that proper forms of conveyance were made by Harold L. Haskins and wife to Karl Nelson, whereby the title to all the real estate and personal property was conveyed to Karl Nelson, for the use and benefit of Karl Nelson and Donald W. Lyle.

It is further alleged that the defendants Harold L. Haskins and wife conspired with their codefendants, Henry O. Johnson and wife, to violate the restrictive clause of the agreement above quoted, the latter having at all times full knowledge of the agreements and their contents; that the defendants have been and are now carrying out their unlawful conspiracy to breach and evade the terms and conditions of the agreement, and are operating and engaging in the buying, selling, and manufacture of timber and lumber products, both directly and indirectly, are competing with the business carried on by plaintiffs in Lewis county, have been and are soliciting orders for the sale of their products in such county and elsewhere in competition with plaintiffs, and have acquired real and personal property in furtherance of their purpose.

It is further alleged that defendants have acquired real property near plaintiffs' lands, have commenced to and are erecting a mill upon such lands, and have purchased

equipment to be used in the operation thereof; that in furtherance of this unlawful purpose defendants have employed dummies to appear as owners and purchasers of some of the equipment and property to be used in further-ance of their unlawful acts.

Plaintiffs pray that a temporary restraining order issue, restraining and enjoining defendants and each of them and all persons conspiring with, aiding, or assisting them in doing the unlawful acts set forth in the complaint, and that, upon hearing, the order be made final and all persons con-spiring with, aiding, or assisting them be permanently enjoined for a period of ten years from and after May 18, 1943, from carrying on any lumbering or sawmill operations or the buying and selling of timber and lumber products or erecting or constructing any mill in Lewis county for the purpose of the manufacture and sale of lumber.

Defendants, by their answer, denied the material allega-tions of the complaint, and especially denied that Harold L. Haskins and wife or the other defendants have violated any of the terms or conditions of the contracts herein first above mentioned. It is also denied that defendants Harold L. Haskins and wife have any interest in the manufacturing plant which defendants claim is now being operated by Henry O. Johnson and Robert E. Haskins, son of Harold L. and E. Roberta Haskins. The reply denied the affirmative matter set forth in defendants' answer.

The cause came on for hearing on January 17, 1945, and, after some testimony was taken, was continued to April 19, 1945. Thereafter, on September 8, 1945, the court entered its judgment in favor of plaintiffs. We shall later refer to those parts of the judgment to which particular exception is taken.

Henry O. Johnson and wife have appealed from the judgment entered. No appeal was taken by Harold L. Haskins and wife.

Appellants assign as error the denial of their motion for nonsuit made at the close of respondents' case; the entering of any injunction against appellants; the enjoining of the operations of the business of appellant Henry O. Johnson

and Robert E. Haskins; and the enjoining of the use of lands owned by appellants and Robert E. Haskins for the use of a lumbering business, for ten years.

In order to avoid confusion, we state again that Harold L. Haskins is the father of Robert E. Haskins, and it was Harold L. Haskins and wife who made and entered into the contracts with Karl Nelson. We may state further at this time that no question is raised as to the compliance by Nelson with all the terms of the agreements.

The main contention of all the defendants at the trial, and by appellants herein, is that there has been no violation of any of the terms of the agreements by Harold L. Haskins and wife, or either of them, or by these appellants, or either of them.

The facts which the trial court was entitled to consider are not greatly in dispute, but the question is in regard to the interpretation to be given to such facts.

Harold L. Haskins and wife resided in Morton, Lewis county, Washington, where they owned and operated a sawmill and lumber manufacturing business. They purchased side cuts from various tie mills in the vicinity of Morton, which side cuts are called cants. These cants were cut into two-by-four's and then sold. There was and is only a limited supply of these cants in that vicinity, and it is not practicable to ship in cants from other districts. Harold L. Haskins had had considerable experience in the mill business.

On May 18, 1943, Harold L. Haskins and wife entered into the contracts hereinbefore referred to and as set out in the complaint, whereby they agreed to sell to Karl Nelson their sawmill and lumber manufacturing business, including good will, for the price of $52,500, of which $15,000 was to be paid in cash and the balance in monthly installments. It is admitted that the entire purchase price has been paid and proper conveyance delivered by Harold L. Haskins and wife.

The supplemental agreement contained the provision relative to Harold L. Haskins and wife engaging in a competing business in Lewis county for a period of ten years.

This particular provision we have hereinbefore set out, and we only again call attention to the fact that the provision prohibited the seller from

". . . entering into or engaging *directly or indirectly* in lumber manufacturing or selling in competition with the buyer within the county of Lewis, state of Washington, for a period of ten years."

For some years during the time Harold L. Haskins and wife were operating the mill and business, and at the time they sold to Nelson, they had in their employ one C. B. Perkins, who was an accountant, his duties pertaining mostly to the office work. After the sale to Nelson in May, 1943, Perkins continued to work for the new owner in the same capacity until November, 1943.

Perkins quit the employ of respondents in November, 1943, and started in business for himself, buying cants from local tie mills. He seems to have had some trouble in buying these cants, or at least in getting them cut, so he decided he would build a mill himself to manufacture the cants into lumber. Apparently realizing that he did not have sufficient funds to erect and equip a mill, Perkins first contemplated just a shed equipped with a planer and an edger. He discussed his problems with Harold Haskins and asked his advice in regard to the project.

During this discussion, Harold Haskins made the suggestion that, to carry out this purpose, Perkins form a partnership with Robert E. Haskins, who, Perkins was told by Harold, had some capital. Robert E. Haskins was at that time about twenty years of age, was in the navy, and stationed at Pasco, Washington. Before entering the navy, Robert had been a student at the University of Washington for a period of two years, and had had no substantial, if any, business experience.

Perkins, knowing of the agreement. between Harold Haskins and respondents, was reluctant about entering into any such relation as suggested by the father, Harold Haskins. However, after obtaining legal advice to the effect that Harold could make a loan either to his son or to Perkins or to both, and that the making of such a loan would

not constitute a violation of the Nelson agreement, so long as Harold had no other interest in the business to be formed and operated by Perkins and Robert Haskins, Perkins agreed to the partnership arrangement.

In order to finance the business and the building of the mill, Harold Haskins agreed to make Perkins a loan of seven thousand dollars, to be secured by a mortgage on Perkins' farm, and also a loan to Robert of five thousand dollars for Robert's share in the partnership. It may be noted here that Harold did not agree to make any loan to Perkins until after the partnership arrangement was agreed to.

The partnership agreement between Perkins and Robert Haskins was entered into about June 1, 1944, and the business was to be conducted under the firm name of "Morton Sales Co." The partnership, on June 15, 1944, filed the certificate required by Rem. Rev. Stat., § 9968 [P. P. C. § 768-5].

It may be noted here that no written partnership agreement was offered or introduced in evidence, and it does not appear that Robert Haskins was consulted in regard to the formation of this partnership, all of the discussions relating to the partnership being had between Harold Haskins and Perkins.

On June 19, 1944, Perkins and wife executed and delivered to H. L. (Harold) Haskins a real estate mortgage on their ranch to secure a loan of seven thousand dollars.

Perkins testified that on June 17th, Harold brought to him a check for five thousand dollars, signed by Roberta Haskins (Mrs. Harold Haskins), which check, as we understand it, was to represent the contribution of Robert Haskins, at that time, to the firm of Morton Sales Co.

On June 3rd, after some discussion with Harold Haskins, Perkins purchased the mill site where the sawmill was to be, and subsequently was, erected, which site is about two blocks from the sawmill which respondents purchased from Harold Haskins and wife. Perkins invested in this enterprise about thirty-eight hundred dollars of money which he had, and about forty-five hundred dollars of the seven

thousand dollar loan obtained from Harold Haskins. In planning the construction of the mill and placing of the machinery, Perkins at different times consulted with Harold Haskins. Harold also went with Perkins to buy machinery for the mill, and visited the mill site several times a week during the construction of the mill.

It became evident that the five thousand dollars contributed by Robert in the manner before stated, and the eighty-three hundred dollars contributed by Perkins would not be sufficient to build and equip the kind of a mill contemplated. Harold did not like the way Perkins was building the plant and did not feel secure, according to Perkins, in regard to the claimed loans made by Harold to Perkins and Robert. Although Robert was in the navy, Harold wanted him to have control of the business, and he at first refused to make any further loan to the business unless Robert had control. However, it was finally agreed that Harold would loan an additional fifty-four hundred dollars.

To secure the amount last above named, Perkins and wife and Robert Haskins gave to Harold Haskins a real and chattel mortgage upon the land purchased by Perkins and the machinery and equipment then located thereon. The mortgage contained the following provision:

"The business of the mortgagors, for the time being, will be conducted under the management of the mortgagor, C. B. Perkins. The mortgagee has no interest in the business, but it is expressly stipulated, anything in this mortgage or the note secured hereby to the contrary notwithstanding, that in the event the mortgagee deems himself insecure, *whether as a result of the operation of the business or otherwise, and whether the opinion of the mortgagee is well-founded or not,* he may declare the whole sum secured hereby due and payable at once, and if not paid may foreclose this mortgage." (Italics ours.)

It is a little difficult to determine just how this fifty-four hundred dollars was applied. Perkins stated that he received only seven hundred dollars, and was informed that two thousand dollars had been credited upon his original farm loan, and twenty-seven hundred dollars had been credited on the five thousand dollar loan to Robert. At this

time, Perkins had nine thousand dollars and Robert five thousand dollars in the business.

On September 20, 1944, Robert Haskins gave his father, Harold, a power of attorney whereby Harold was authorized

". . . to sell, mortgage and incumber any real estate or personal property standing in my name; and to purchase for cash or on terms any real and personal property; and to do all things necessary that may be deemed such for the best interests of myself in management and operation of any business that I am now interested in or may hereafter be interested in."

According to Perkins, the discussion continued between Harold Haskins and himself relative to the control of the Morton Sales Co. Perkins stated that Harold seemed to think that the one who had the most money in a partnership should have the control, as in a corporation, and that, in furtherance of this idea, in August, 1943, Harold invested six thousand dollars more in the business, in order that Robert might have control. It will be noticed that the six thousand dollar check is dated in August, prior to the power of attorney given by Robert to his father.

Perkins testified that he first received the above six thousand dollars, which was signed by Robert Haskins; that he deposited the check in the bank, and the next day he was informed the check was no good, as Robert had no money in the bank; that he told the cashier he had to have the money that day; that Harold told the cashier to give him the check; that apparently Harold placed his name on the check, and it was then honored by the bank.

Joe Bowden testified that Harold Haskins hired him to overhaul a planer, which was subsequently moved down and installed in the plant of the Morton Lumber Supply Company (formerly Morton Sales Co.); that Harold Haskins told him where to install the planer; that he installed most of the machinery and was directed by Harold Haskins where to place it, until the arrival of one Pete Powell, who instructed him where to install the last of the machinery. This witness further testified that Harold was at the plant

once or twice a day until he (Harold) went east. He also testified that Harold told him to buy babbitt for the planer. "Q. What did he say about it? A. Oh, he told me to buy all I needed for the whole mill."

About this time, Perkins learned that a suit by respondents against him and Harold Haskins was imminent because of a claimed violation of the Nelson agreement. While the mill was not yet completed and the business was not actually in operation, Perkins did not want to become involved in such a lawsuit. He informed Harold Haskins of the situation, and suggested that he might take over the Robert Haskins interests and obligations. Harold did not favor this proposition, and so Perkins agreed to sell his interest for what he had in the business. Perkins stated that Harold asked him what he wanted for his interest, and Perkins said "what I had in it," continuing "And he [Harold] said, well, the words he used was that he would put a certified check in the bank to pay for it. He never did." Subsequently, Perkins received a check from Henry O. Johnson for the amount for which he told Harold he would sell.

Henry O. Johnson and wife, appellants herein, came into the picture about October 2, 1944. Johnson had been working as a salesman for W. P. Fuller & Co., in Tacoma, for about seven years, or from 1937 to 1944. He was thirty years old, and had had no manufacturing experience and no mill experience other than a few months as a laborer in different mills. Joe Bowden, to whom we have hereinbefore referred, had the following to say of Johnson's knowledge of the mill operations:

"Q. Did Johnson give any evidence of understanding anything about sawmill operations? A. He didn't know a thing. Q. And did you keep that up [supervising operation of the plant] until the time that [Harold] Haskins came back? A. Yes. Q. You say Johnson didn't know a thing about sawmill operations? A. He didn't know which side of an edger the lumber went through on. Before it was set up he went around on one side and tried to say that it went through the opposite side."

Mr. Johnson testified that, when he bought out Perkins, he assumed his assets and liabilities in the company; that he obtained a check from Harold Haskins for twenty-five hundred dollars with which to pay Perkins. Johnson stated that he was first approached by Robert Haskins in regard to forming a partnership, and that Robert told him that his father (Harold) would loan him the money; that before the deal was closed he discussed the matter with Harold Haskins, and Harold stated to him that he would loan him some money to go into the venture:

"Q. Did you subsequently find out from [Harold] Haskins how much he would loan you? A. Yes. Q. Was that all done before you entered into the partnership arrangement? MR. HULL: You mean the written partnership? MR. CUNNINGHAM: Yes. MR. CUNNINGHAM: Q. (continuing) Before you had agreed upon your venture? A. Yes. Q. All done? A. Yes. Q. Did he tell you about this contract he had made and entered into between these other people not to engage in a similar business? A. I knew about it. Q. You knew all about it? A. Yes. Q. At the time you entered into the venture? A. Yes. Q. Did you discuss that with the defendant Haskins? A. Yes."

Johnson stated he originally put five thousand dollars into the venture. This money he obtained by selling some bonds through a Tacoma bank. The bank gave him the money, which he carried to Morton.

The formal partnership agreement was entered into about October 4, 1944, and on that date Johnson and Robert Haskins executed a real and chattel mortgage in favor of Harold Haskins to secure a loan of twelve thousand dollars. This mortgage contained a provision like the one executed by Perkins and Robert Haskins, which provision has been set out herein.

After Johnson came into the firm, the name was changed to Morton Lumber Supply Company. Johnson took over the management of the Morton Lumber Supply Company, and, as stated by him, under his supervision the mill was completed and production started. Harold Haskins, having returned from the east, visited the plant at regular intervals

and gave expert advice, and kept himself informed in regard to the business.

The business of the Morton Lumber Supply Company is in general the same as respondents' business purchased from Harold Haskins; in other words, the supply company buys cants from tie mills and manufactures them into two-by-four's, eight feet long. It may be stated here that respondents' plant was the only plant of its kind in operation in the Morton district, until the plant of the supply company was built.

There is much additional testimony in the record bearing on the actual relationship of Harold Haskins to the Morton Lumber Supply Company, and also bearing upon the actual status of Robert Haskins and Henry Johnson in connection with this business.

The trial court, after hearing the evidence and arguments, made and entered its judgment. We quote the following portion of the judgment as indicating the court's findings on the facts, and the theory upon which the relief granted was based:

"That the said defendants, H. L. [Harold] Haskins and E. Roberta Haskins, his wife, acting through the aforementioned C. B. Perkins, Robert E. Haskins, H. O. Johnson and Irline D. Johnson, his wife, commenced to and did construct a sawmill upon said lands so purchased by them and thereafter completed the same and the same is and ever since on or about the 1st of November, 1944, has been operated by them under the firm name and style of 'Morton Lumber and Supply Company,' and in said operation they are competing both directly and indirectly with the plaintiffs in the carrying on of plaintiffs' business as aforesaid and in violation of the terms of the contract entered into between the parties.

"And it further appearing to the court that the real owners of said sawmill operation are H. L. Haskins and E. Roberta Haskins, his wife, and that the same is being operated through the defendants, H. O. Johnson and Irline D. Johnson, his wife, and Robert E. Haskins, and that the said H. O. Johnson and Irline D. Johnson, his wife, and Robert E. Haskins, son of H. L. and E. Roberta Haskins, at all times had full knowledge of the contract and agreement made and entered into between plaintiffs and H. L. Haskins and

E. Roberta Haskins, his wife, and are conspiring with and aiding and abetting the said H. L. Haskins and E. Roberta Haskins, his wife, to breach and violate the terms of the agreement as aforesaid and that the said H. L. Haskins and E. Roberta Haskins, his wife, dominate and control the whole enterprise and have expended large sums of money in the purchase of the real estate and the machinery used in connection with the carrying on of said enterprise and that the pretended partnership between H. O. Johnson and Robert E. Haskins operating under the firm name of 'Morton Lumber and Supply Company' is a sham and used for the purpose of concealing the identity of H. L. Haskins and E. Roberta Haskins, his wife, with said enterprise. . . .

"It is Further Ordered, Adjudged and Decreed that you the said defendants, H. O. Johnson personally and H. O. Johnson and Irline D. Johnson, as a community, and Robert E. Haskins, your servants, agents, attorneys and all other persons are hereby perpetually enjoined and restrained from aiding, abetting, conspiring or confederating with the said H. L. Haskins personally and H. L. Haskins and E. Roberta Haskins, his wife, in carrying on either directly or indirectly, or engaging in the manufacture and sale of lumber in Lewis county, Washington, for a period of ten years from and after the 19th day of April, 1944, and

"It is Further Ordered, Adjudged and Decreed that you the said defendants, H. L. Haskins and E. Roberta Haskins, H. O. Johnson and Irline D. Johnson, and Robert E. Haskins, and all persons holding or claiming by, through or under you, or any of you, are hereby perpetually enjoined and restrained for a period of ten (10) years from and after the 19th day of April, 1944, or until such time as plaintiffs discontinue their business of buying, manufacturing and selling lumber in Lewis county, Washington, from entering into or engaging either directly or indirectly in the manufacture and sale of lumber in, upon and from the real estate and premises hereinafter described as follows, to-wit:

[Then follows description of the real estate on which the sawmill in question is situated.]

"And It Is Further Ordered, Adjudged and Decreed that plaintiffs are hereby given judgment against the defendants, H. L. Haskins, personally, and H. L. Haskins and E. Roberta Haskins, his wife as a community, in the sum of Five Hundred ($500.00) Dollars, together with the costs and disbursements of this action."

Robert E. Haskins was not made a party defendant and, of course, was not served with any pleadings in the case. It appears that he was personally present in court at least one day, but he was not called as a witness.

This is an equity case, triable *de novo* on appeal, and, if there is sufficient evidence in the record to warrant the conclusion and decree of the trial court, the same will not be disturbed. *Merager v. Turnbull,* 2 Wn. (2d) 711, 717, 99 P. (2d) 434, 127 A. L. R. 1142.

While it is appellants' contention that Harold Haskins and wife only loaned money to their son Robert and to appellants Johnson, that Harold Haskins and wife had no interest in the Morton Lumber Supply Company, other than in a return of the money loaned and the payment of interest on the loan, and that the making of these loans was no violation of the restrictive agreement, we are of the opinion the evidence fully justifies the conclusion that, in fact, the Morton Lumber Supply Company was the business of Harold Haskins and wife, or, at least, that they were substantially interested in it. In other words, it seems to us that the conclusion is inescapable that Robert Haskins and Henry Johnson were in fact nothing more than dummies, whose names were used by Harold Haskins to evade the effect of the restrictive clause in the Nelson contract.

It is a breach of a covenant not to engage in a competing business, for the promisor to engage in such business in the name of another who has in fact no interest therein. 93 A. L. R. 139, V. *Doing business in name of another.*

In *Loutzenhiser v. Peck,* 89 Wash. 435, 154 Pac. 814, it appears that the defendant Hugh Peck sold his retail meat business, with a covenant in the bill of sale that he would not engage in such business as owner, manager, or clerk, within one mile of New York Market at 02721 Monroe street, Spokane, for not less than two years. Peck testified that he purchased the fixtures for and equipped a new market with his separate funds and gave it to his wife. This market, which was subsequently operated by the wife or through a

renter, was within the prohibited area. In holding that this was a breach of the contract made by Peck, we stated:

"Stating it in another way, the husband could not avoid the covenant, even conceding it his separate covenant, by turning his property over to his wife as a gift and setting her up in the same business at the same place. To permit him to do so would be to sanction the use of his own property in fraud of the respondent's rights and in palpable evasion of his own covenant. Looking through technicalities to essentials, that is the ultimate end of appellants' position. It is unsound."

In *Merager v. Turnbull*, 2 Wn. (2d) 711, 99 P. (2d) 434, Alex Turnbull sold to plaintiff all of the personal property used by the vendor in connection with an undertaking business upon premises owned by the vendor, known as 615 west Fourth avenue, Spokane, Washington. Included in the sale to Merager were the good will of the business and the right to the use of the name "Turnbull Funeral Home" in the future conduct of the undertaking business. The vendor also agreed to refrain from engaging in the undertaking business within the limits of the city of Spokane. Later, Bruce Turnbull, son of Alex Turnbull, opened up and conducted an undertaking business on Third avenue, in Spokane. Alex Turnbull decided to build a mortuary on his property at the corner of Fourth and Howard streets, to aid his son Bruce, who had been unable to obtain an extension of the contract under which Bruce was occupying the building of Mr. and Mrs. Andrews.

In November, 1938, plans for the new building were announced in the press, and the information was given to the public that the business would be conducted by both Alex and Bruce Turnbull. Merager instituted an action against Alex Turnbull and wife and Bruce Turnbull and wife, to recover damages and injunctive relief. In holding that Bruce Turnbull and his father entered into a conspiracy to unfairly compete with and destroy the plaintiff's business, we stated:

"The evidence tends to prove, hence was admissible, that Alex Turnbull was interested in the Turnbull Company not only as a father in the affairs of his son, but that he was

interested in a financial and substantial way. . . .

"While the authorities are in conflict on the question whether the mere lending of money or extension of credit to one engaged in, or about to engage in, a competing business, is a violation of a restrictive covenant such as is before us in the case at bar, a review of those cases is unnecessary. To permit Bruce Turnbull to conduct the undertaking business practically next door to the undertaking business of respondent, would render valueless the rights of respondent under his contract with Alex Turnbull, and the injunction against Alex Turnbull would be a futile gesture. *Operations under the guise of assistance to relatives may not be utilized to violate contracts of the character of the one before us.* The evidence sustains the decree, which is to the effect that the execution of the lease under which the building owned by Alex Turnbull was to be used by Bruce Turnbull does not reflect the true relationship of the parties." (Italics ours.)

The statements last above quoted are, in our opinion, particularly applicable to Robert Haskins and his father in the instant case.

■ We are of the opinion the evidence not only justifies the conclusion of the trial court that Harold Haskins violated the restrictive covenant contained in the contracts with respondents, but also the court's conclusion that Harold Haskins and wife entered into a conspiracy with Perkins, Robert Haskins, and appellants Johnson to violate the restrictive covenant, and that Johnson and Robert Haskins were aiding, abetting, conspiring, and confederating with Harold Haskins in the violation of such covenant. We quote from 11 Am. Jur. 585, § 56:

"To establish liability for a conspiracy, it is sufficient if the proof shows concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt act was committed in furtherance of a common design, intention, and purpose of the alleged conspirators. In other words, circumstantial evidence is competent to prove conspiracy."

In 15 C. J. S. 1043, Conspiracy, § 29, the rule is stated as follows:

"The fact of the conspiracy may, of course, be shown by

direct evidence, and should be so proved if this character of evidence is available; but since direct evidence is ordinarily in the possession and control of the alleged conspirators and seldom can be obtained, a conspiracy usually is susceptible of no other proof than that of circumstantial evidence, and therefore it is a well-settled rule that proof by direct and positive evidence is not necessary, and that circumstantial evidence, that is, evidence of the *acts* of the alleged conspirators and of the *circumstances* surrounding the transaction which is the basis of the charge, is admissible to prove the conspiracy charged." (Italics ours.)

See, also, *Sova v. First Nat. Bank of Ferndale,* 18 Wn. (2d) 88, 138 P. (2d) 181.

█ . Having concluded that a conspiracy existed between the parties named, the liability of the conspirators is joint and several. 11 Am. Jur. 577, 578, § 45.

█ Appellants Johnson, entering into the conspiracy after it was formed between Harold Haskins, Perkins, and Robert Haskins, became liable for all acts committed by any of the other parties, either before or after their entrance, in furtherance of the common design. 11 Am. Jur. 580, 581, § 48, 15 C. J. S. 1030, § 19.

█ Since the liability of the conspirators is joint and several, an action may be brought against only one of the conspirators, or plaintiff may, at his option, join all the conspirators as defendants in one action. 15 C. J. S. 1034, § 23.

Under the title Injunctions, in 43 C. J. S. 830, § 175, subhead Tort-Feasors, we find the following statement:

"Where the acts sought to be enjoined are tortious, it is proper to join as defendants all the tort-feasors, even though there was no concert or unity of design among them. However, in a suit to enjoin tortious acts, it is not necessary to join all the tort-feasors as defendants, since a person receiving injury from the tortious acts of others has a remedy against one or all of the tort-feasors and may enforce that remedy against one or all at his election, either at law or in equity."

█ Having in mind the above rules, let us look at the status of the persons found to be engaged in this conspiracy and at the contention made by appellants in regard to such persons. Appellants state in their brief:

"In this case, however, the question of whether there was a conspiracy between Perkins and Harold L. Haskins was not before the court, because Perkins was not a party to the action."

We are of the opinion there is no merit to the above contention. Suit having been instituted against some of the conspirators, *tort-feasors,* the whole conspiracy was before the court.

■ Appellants Johnson, as *tort-feasors,* were proper parties to the action. They were named defendants and were served with process. However, appellants contend that they did not sign the contracts containing the restrictive covenant, and that, the evidence being insufficient to show that they or either of them were aiding and assisting Harold Haskins in violating his covenant, they could not be enjoined from engaging in such business. However, having found there was sufficient evidence from which it could reasonably be inferred that appellants were assisting and aiding Harold Haskins, this argument falls. The rule that a stranger to a covenant may properly be enjoined from aiding and assisting the covenanter in violating his covenant is supported by an overwhelming weight of authority. See 94 A. L. R. 345; *Merager v. Turnbull,* 2 Wn. (2d) 711, 99 P. (2d) 434; 43 C. J. S. 569, § 84; 28 Am. Jur. 298, Injunctions, § 104.

■ As hereinbefore stated, Robert E. Haskins was not made a party to this action. That the failure to make Robert a party to the action would not necessarily defeat recovery as to the other defendants, is evident from what has been stated herein. However, it is appellants' contention that the injunction, in so far as directed personally against Robert Haskins, the partnership between him and Johnson, and the property of such partnership, is void because Robert was not made a party to this action.

While it may be conceded for the sake of argument that the injunction directed personally against defendants Johnson and Robert E. Haskins may indirectly involve the alleged partnership between them, yet as far as the partners are enjoined from carrying on the partnership business and

using the partnership property, it appears from the record that this was not an action against the partnership, but against one of the partners personally, and since both are jointly and severally liable, it was not necessary to bring in both partners or the partnership.

▮ Appellants contend the decree is void because Robert Haskins, one of the partners, was serving in the military service, and no judgment could be taken against him or his property except in accordance with 50 U. S. C. A. (App.), §§ 501-527; that the judgment against appellants and the injunction against Robert Haskins was a charge against the interest of a person in the military service.

Neither appellants Johnson nor Robert Haskins moved in the lower court for a stay of proceedings under the soldiers and sailors' civil relief act of 1940, 50 U. S. C. A. (App.), § 521. The question of whether or not such motion should have been granted is not before this court. See *Young v. Evans,* 62 Cal. App. (2d) 365, 144 P. (2d) 651; *State ex rel. Frank v. Bunge,* 16 Wn. (2d) 358, 133 P. (2d) 515.

▮ Appellants are relying on 50 U. S. C. A. (App.), § 520. Assuming for the sake of this argument that the relief granted against Robert Haskins, though not made a defendant in the action, was a default judgment, thus coming under the provisions of § 520, *supra,* nevertheless it appears that a judgment entered without complying with the provisions of § 520 is not void, but only voidable at the instance of the serviceman.

▮ Section 520, *supra,* and § 520 (4) of the act were construed in *Mims Bros. v. N. A. James, Inc.,* 174 S. W. (2d) (Tex. Civ. App.) 276, and it was therein stated that a default judgment, taken without the affidavit or other requirements of § 520, is not thereby rendered void, but merely voidable at the instance of the *serviceman* (§ 520 (4)), upon proper showing of prejudice and injury. The act is for the exclusive benefit of the serviceman (and others expressly mentioned therein, but not here involved). He alone can take advantage of it, and then only upon showing that his interest has been deleteriously affected. See, also, *Hynds v. City of Ada,* 158 P. (2d) (Okla.) 907.

We are of the opinion that, under the authority cited, appellant cannot raise the question of respondents' failure to comply with § 520, *supra*.

 We next desire to discuss the question of whether or not the court had jurisdiction to grant the injunctive relief that it did against Robert Haskins, he not being a party to the action.

"Jurisdiction of a court sufficient to justify the issuance of an injunction involves both jurisdiction over the cause as well as over the parties. . . . An injunction granted by the court without jurisdiction is void." 43 C. J. S. 793, § 168.

"A permanent injunction should not be granted by final decree against persons improperly made parties and dismissed from the suit, or against persons not made parties and not in court unless they are *legally identified* with a party and privy to his performance of the *prohibited act,* such as officers, agents, employees, associates, or confederates of such party." (Italics ours.) 43 C. J. S. 947-948, § 214.

"A person may have such a connection with an injunction suit or a party thereto as to be bound by the final decree thereof, of which he has knowledge, even though he is not formally and specifically named a party to the suit." 43 C. J. S. 959-960, § 220.

"Agents or employees of one against whom an injunction has been granted and who have knowledge of such fact, are bound by the injunction as long as such status continues and are punishable for contempt in disobeying its provisions, although not made parties to the injunction suit, and although they were not served with process, at least where the injunction runs against the agents, servants, or employees of a party. . . .

"It is very generally held that all persons who *aid* and *abet parties to the suit,* against whom an injunction has been rendered, in disobeying it, or *who conspire with them* for its violation, are guilty of a contempt of court if they have actual knowledge of the injunction, *although not themselves parties to the suit* or named in the order granting the injunction." (Italics ours.) 43 C. J. S. 1012, § 263.

"An injunction decree should conform to the requirements of equity decrees generally. The relief should run only against those who are parties and are properly before the court and should not attempt to bind persons who are

not named or served as defendants and who are not brought within the court's jurisdiction. Of course, persons not technically agents or employees of the defendant may be specifically enjoined from knowingly aiding the defendant in performing a prohibited act *if their relation is that of associate or confederate,* for such persons are legally identified with the defendant. This rule, however, applies only to confederates or associates of the defendant and not to all persons having notice of the injunction, irrespective of whether their rights have been adjudicated." (Italics ours.) 28 Am. Jur. 472, § 300.

"Despite expressions in some authorities, however, that at first blush lend support to the contrary conclusion, it seems that a theory of disobedience of an injunction cannot be predicated on the act of a person who is not included in its terms, either by name or as a member of a class of persons which is properly included, *or who is not acting in concert* with or as an aider or abettor of one so included in the assertion of his claims. It is the common practice, however, to make the injunction run also to *classes of persons through whom the enjoined party may act,* such as agents, servants, employees, aiders, abettors, etc., *even though they are not parties to the action.* This practice is upheld by the courts, and any such persons violating the terms of the injunction with notice thereof may be held liable for such disobedience." (Italics ours.) 28 Am. Jur. 506, § 332.

See, also, *Chase Nat. Bank v. Norwalk,* 291 U. S. 431, 436, 78 L. Ed. 894, 54 S. Ct. 475; *Dixon v. Talerico,* 217 App. Div. 191, 217 N. Y. S. 482; *People ex rel. Stearns v. Marr,* 181 N. Y. 463, 74 N. E. 431, 106 Am. St. 562; *State ex rel. v. Lavery,* 31 Ore. 77, 49 Pac. 852; *State ex rel. Lindsley v. Grady,* 114 Wash. 692, 195 Pac. 1049, 15 A. L. R. 383.

In view of the fact that we have concluded that Robert E. Haskins was in fact only a dummy, who was aiding and abetting his father, Harold Haskins, to breach and violate the terms of the restrictive covenant, we are of the opinion the court had jurisdiction to enjoin Robert Haskins, personally, although he was not a party to the suit and was not served with process.

We are further of the opinion the court had jurisdiction to enter its judgment enjoining H. O. Johnson, per-

sonally, H. O. Johnson and Irline Johnson, as a community, and Robert E. Haskins, their servants, agents, or attorneys, from aiding, abetting, conspiring, or confederating with H. L. Haskins, personally, and H. L. Haskins and E. Roberta Haskins, his wife, in carrying on, either directly or indirectly, or engaging in the manufacture and sale of lumber in Lewis county, Washington, for a period of ten years from and after April 19, 1944. In other words, that part of the judgment above referred to as entered was proper, except that we are of the opinion there should be eliminated therefrom the words *"and all other persons."*

Appellants' last contention is that the decree is erroneous in so far as it enjoins the use of real property for a legal purpose.

By the decree Harold Haskins and E. Roberta Haskins, H. O. Johnson and Irline Johnson, and Robert E. Haskins, *and all persons holding or claiming by, through or under them,* are perpetually enjoined and restrained for a period of ten years from entering into or engaging, directly or indirectly, in the manufacture and sale of lumber in, upon, and from the real estate and premises therein described.

We do not understand that respondents ever contended that either Robert Haskins or the Johnsons were not perfectly free to construct a sawmill and enter the lumber business in Lewis county, but it was respondents' contention that they could not do so by entering into a conspiracy with Harold Haskins for the purpose of enabling the latter to break his restrictive covenant with respondents.

We are of the opinion, therefore, that it was not the purpose of respondents to restrain the appellants from carrying on a legal business on certain land, but to restrain them from carrying on such legal business in a tortious way, that is, as conspirators with Harold Haskins and wife.

The building of the mill, the operation of which is sought to be enjoined, in contemplation and execution of the conspiracy, and the manufacture of lumber therein, are within the conspiracy, and any sale of the mill contemplating the continuation of the business by the purchasers is a perpetuation of the tortious act.

Different kinds of injunctions which may be granted to protect a covenantee's rights should be distinguished. Thus we have injunctions directed against the premises; injunctions directed merely against the defendants named in the action and not against the use of the property by other persons; and injunctions directed against the defendants named therein, binding, however, upon certain other persons, not named in the action, by reason of a certain relationship between such persons and defendants.

While the general rule seems to be that equity acts *in personam,* there are certain exceptions to this rule, whereby a court of equity has power to enforce certain equitable rights by acting *in rem.* 19 Am. Jur. 52, §§ 23, 24; 30 C. J. S. 502-503, § 102; 1 Pomeroy's Equity Jurisprudence 183-185, §§ 134, 135.

The type of case where a decree may be entered enjoining the defendants in the action and all other persons from maintaining a nuisance is illustrated by the case of *State v. Porter,* 76 Kan. 411, 91 Pac. 1073, 13 L. R. A. (N.S.) 462, where a decree was entered enjoining the defendant and all persons whomsoever from keeping a nuisance, as defined by the liquor laws of the state, in a certain building, upon certain real estate. The court held such injunction was a restriction, in the nature of an encumbrance, upon the use of such building, of which all subsequent owners, tenants, or occupants thereof must take notice at their peril.

Such cases are not in point here, for while in the nuisance cases the use of the land for the prohibited purpose is unlawful as to all persons, in the instant case we are concerned with a lawful business, not forbidden by statute, participation therein being unlawful for Harold Haskins and wife, H. O. Johnson and wife, and Robert Haskins, only because their operations constitute a violation of Harold Haskins' agreement with respondents.

The following statement found in 28 Am. Jur. 505, § 331, seems to be quite generally accepted:

"While at one time it was universally recognized that equity acts in personam and not in rem, this rule has now been changed by statutes in almost all jurisdictions, and

equity decrees may in all cases be so framed as to act on property. A judgment or decree for injunctive relief may be, and usually is, in personam, but such judgment or decree may act in rem by virtue of statutes empowering courts of equity to restrain the use of realty for certain purposes. This class of cases, where it is said the injunction is directed against the premises, is to be distinguished from those cases where the decree is directed merely against the defendants named therein, and not against the use of the property by other defendants. In the latter class, the decree is treated as one in personam, and a subsequent occupant of the building who is not a party to the original suit has been held not to be within the decree. A decree is conclusive upon and binds the parties to the litigation and those who are represented by such parties or are in privity with them. By 'privity,' in this regard, is meant the mutual or successive relationship to the rights of property, and privies are classified according to the manner of this relationship. The reason why persons standing in this relation to the litigating party are bound by the proceedings to which he is a party is that they are identified with him in interest.

"While subject to the qualification that notice or knowledge of the decree under certain circumstances may render a person subject to a decree or injunction, it may be laid down as an accepted principle of law that persons who are not parties to the injunction or in privity with them and whose rights have not been adjudicated therein are not bound by the decree in so far as it operates in personam, and cannot be made liable for acts done contrary to its terms, even though it assumes to bind them. Particularly is this true where they act without notice or knowledge of the injunction."

In *Chase Nat. Bank v. Norwalk*, 291 U. S. 431, the city of Norwalk alone was made defendant. The decree enjoined the city, its officers, agents and employees, "and all persons whomsoever to whom notice of this order shall come." The supreme court, in reversing the judgment, held it was error to extend the injunction to persons who merely acquired notice of it, but who were neither parties to the suit nor confederates or associates of the defendant.

In *State ex rel. Lindsley v. Grady*, 114 Wash. 692, 195

Pac. 1049, the trial court entered a decree enjoining the defendants

". . . and all others not now known whose names and identity may hereafter be disclosed from associating, confederating, affiliating and acting in concert with said named defendants."

The appellant, not being a named defendant, was arrested, tried, and found guilty of contempt for violating the decree entered. The judgment was reversed by this court on appeal. In the cited case, we stated:

"Extended argument has been made attacking the validity of the decree, but we find it unnecessary to discuss that phase of the case, and will assume, without deciding, that the court had jurisdiction to enter such a decree and that the decree was in all respects valid and binding. The rule is in cases of injunction that the injunction binds the parties defendant, who are named and upon whom service has been secured, and all other persons who have knowledge of its provisions. In other words, that persons not parties to the injunction proceeding and against whom the decree is not directed by name may be punished for contempt if they violate the terms of the decree, provided that, subsequent to the making of the decree, they have been served with a copy of it or have had notice of it."

 While in our opinion the decision in the instant case is not so broad as those entered in the *Chase National Bank* case and in the *Lindsley* case, *supra*, it nevertheless enjoins not only the persons expressly named in the decree, but also, as to the described real estate, *"all persons holding or claiming by, through or under you or any of you."*

Realizing that in most injunctions of this kind it must be left to be decided in future contempt proceedings whether or not a specific person is covered by and liable under such decree, and with the foregoing rules in mind, we are of the opinion that that portion of the judgment to which we are now referring should be modified to read as follows:

IT IS FURTHER ORDERED, ADJUDGED and DECREED that you the said defendants, H. L. Haskins and E. Roberta Haskins, H. O. Johnson and Irline D. Johnson, and Robert E. Haskins, and all persons holding or claiming by, through or under

you, or any of you, *as agents, trustees, confederates or associates, with notice of this decree,* are hereby perpetually enjoined and restrained for a period of ten (10) years from and after the 19th day of April, 1944, or until such time as plaintiffs discontinue their business of buying, manufacturing and selling lumber in Lewis county, Washington, from entering into or engaging either directly or indirectly in the manufacture and sale of lumber in, upon and from the real estate and premises hereinafter described.

(The italicized portion of the foregoing paragraph has been added to the decree as entered.)

With the modifications indicated, the decree as entered is affirmed. The cause is remanded to the trial court, with instruction to enter a decree in conformity with this opinion. Respondents will recover costs herein.

DRIVER, C. J., BEALS, BLAKE, and ROBINSON, JJ., concur.

