[No. 30117. Department One. April 3, 1947.]

THE STATE OF WASHINGTON, *on the Relation of Donald W. Lyle et al., Respondents*, v. HAROLD L. HASKINS *et al., Appellants.*[1]

*Hull & Armstrong*, for appellants.

*D. J. Cunningham* and *C. D. Cunningham*, for respondents.

SIMPSON, J.—This is a proceeding in which plaintiffs sought to have defendants adjudged in contempt of court. The affidavit, upon which the proceeding was based, charged that: Defendants were violating a decree of the superior court of Lewis county, signed September 4, 1945, which decree ordered that plaintiffs be granted a permanent injunction restraining defendants, their servants, agents, attorneys, and all other persons holding by, through, or under them, from aiding, abetting, conspiring, and confederating with H. L. Haskins personally, and E. Roberta Haskins, his

[1]Reported in 178 P. (2d) 962.

wife, in carrying on, or directly, or indirectly engaging in the manufacture and the sale of lumber in Lewis county for a period of ten years from and after April 19, 1944; and, notwithstanding the provisions of the decree, defendants violated the decree by manufacturing and selling lumber in Lewis county. The plaintiffs prayed for an order holding defendants in contempt of court.

Defendant, Harold L. Haskins (also known as H. L. Haskins), filed an answering affidavit in which he denied that he had violated any of the provisions of the decree.

At the conclusion of the trial, the court made its findings of fact and conclusions of law and, based thereon, entered a decree holding H. L. Haskins and Odin Tjelde in contempt of court. The decree also imposed penalties upon the defendants H. L. Haskins and Odin Tjelde.

Harold L. Haskins and E. Roberta Haskins, his wife, have appealed to this court. The assignments of error call in question the actions of the trial court in entering the order of contempt.

The facts leading up to the entry of the parent decree are set out in *Lyle v. Haskins*, 24 Wn. (2d) 883, 168 P. (2d) 797. The decree, dated September 4, 1945, provided:

"It is Further Ordered, Adjudged and Decreed that you the said defendants, H. O. Johnson personally and H. O. Johnson and Irline D. Johnson, as a community, and Robert E. Haskins, your servants, agents, attorneys and all other persons are hereby perpetually enjoined and restrained from aiding, abetting, conspiring or confederating with the said H. L. Haskins personally and H. L. Haskins and E. Roberta Haskins, his wife, in carrying on either directly or indirectly, or engaging in the manufacture and sale of lumber in Lewis County, Washington, for a period of ten years from and after the 19th day of April, 1944, and

"It Is Further Ordered, Adjudged and Decreed that you the said defendants, H. L. Haskins and E. Roberta Haskins, H. O. Johnson and Irline D. Johnson, and Robert E. Haskins, and all persons holding or claiming by, through or under you, or any of you, are hereby perpetually enjoined and restrained for a period of ten (10) years from and after the 19th day of April, 1944, or until such time as plaintiffs discontinue their business of buying, manufacturing and selling

lumber in Lewis County, Washington, from entering into or engaging either directly or indirectly in the manufacture and sale of lumber in, upon and from the real estate and premises hereinafter described as follows, to-wit: [Description of land in Lewis county]."

The only question for consideration is whether Harold L. Haskins violated the terms of the decree. The answer lies in the facts as presented at the hearing in the contempt proceeding.

The evidence on the part of respondents may be summarized as follows:

Karl Nelson testified that Tjelde moved to the mill in 1945 and worked around the mill, looking after the lumber in the mill and outside the mill. Nelson stated further:

"Well, he helps, or seems to have charge of the yard. I don't see much what he does inside, but what he does outside,—he will help load cars at times and have charge of the stacking of the cants, as we call them. It is not logs, it is tie cants."

Additional testimony given by Nelson was to the effect that, at one time in October, 1945, Tjelde talked about buying Johnson's interest in the mill; that Tjelde and Johnson, his partner, were the only ones working or operating the mill; also, that he (Nelson) had talked to Haskins about buying the mill property. The reported statement made by Haskins was that he had a mortgage upon the property, and that, if he foreclosed the mortgage and got title, he would sell it to Nelson.

Respondents admitted that Haskins did not operate the mill at any time since the entry of the original decree. Haskins and Tjelde also testified that Haskins did not have any part in either the manufacture or sale of lumber after the decree had been entered. There is no testimony whatever to the effect that appellant Haskins had anything to do, directly, or indirectly, with the operation of the mill, after the court entered its decree in September, 1945. The only basis upon which it could be held that Haskins had anything to do with the property was that he held the mortgage upon

it, and that certain payments had been made on that mortgage to him by Tjelde.

Defendant Tjelde was not a party, nor mentioned, in the parent case. In the case at bar, he testified (and there was no contradiction of his testimony) that: He owned a fifty per cent interest in the property, which he acquired from Robert Haskins. He made the deal to acquire it from Robert Haskins April 1, 1945. He started operations in his own right October 25, 1945, set up a new set of books, and named his business the Two by Four Mill. He paid sixteen thousand dollars down on the mill and assumed a mortgage. Asked where he got the money to make the payment of sixteen thousand dollars, Tjelde stated:

"THE WITNESS: I didn't steal it; I have a little place of business in Seattle, your honor. I contracted for a good many years in the building business, and it was all my own money. THE COURT: Well, did you have it on deposit anywhere? THE WITNESS: That is right. THE COURT: Where did you have it on deposit? THE WITNESS: Had some in the Washington Mutual, had some in the People's Bank of Seattle, I had some in the First Federal Savings & Loan, I had some in the, Oh—1411 Fourth Avenue Building, I think is the name of it. That is the address I had it. THE COURT: You had $16,000.00 on deposit in those respective places? THE WITNESS: I had it in either four or five banks. THE COURT: How did you draw it out? THE WITNESS: It was all drawn out by check. They were all cashier's checks. THE COURT: Cashier's checks issued to you? THE WITNESS: No, issued to Rod Haskins, Robert E. Haskins. THE COURT: How did you get the cashier's checks? THE WITNESS: I got it at the bank. THE COURT: How did you get it? THE WITNESS: I just went down and withdrew the money and told them to make a cashier's check for it. THE COURT: Withdrew it by check? THE WITNESS: No, it was practically all in savings accounts. THE COURT: You had to sign something to withdraw it, didn't you? THE WITNESS: That is right. THE COURT: Have you a copy of those withdrawal slips, counsel? MR. BLAIR: No; we can supply them, your honor. THE COURT: Have you examined them? MR. BLAIR: No, I never have. THE WITNESS: I have a receipt at home that gives a listing of all the different banks and from whom they were made and the date. MR. BLAIR: We would be glad to furnish a transcript of his account with each of those banks to show this

withdrawal. THE WITNESS: Puget sound Bank would have a complete record of it. MR. BLAIR: They would have a record of what you delivered to them. THE WITNESS: I think they have a record of the different amounts. THE COURT: I am satisfied he is frank about it."

He testified further that he had paid to appellant Haskins eighteen hundred dollars on the mortgage, which he assumed at the time he purchased the property.

█ Respondents contend that the original decree introduced in the contempt hearing, as well as the decision of this court, established the conspiracy beyond question, and the testimony introduced in the case at bar proves it to be a continuous one. If that were a fact, we would agree with counsel's contention, but there is no evidence whatever to establish that there has been any continuing act on the part of Haskins to show that he engaged in any conspiracy to violate the decree.

Respondents argue that it was found in the parent case that appellants owned the property, and the presumption of ownership continues. The evidence, however, opposes this presumption. It still remains a fact that appellant did nothing in the way of operating the mill since the entry of the original decree. It is true that there are many suspicious circumstances connected with these deals, but legal conclusions cannot be founded upon circumstances of that nature.

There is no statement even in the affidavit in this proceeding to show that Haskins was engaged in a conspiracy to violate the court's order.

██ Counsel for appellant attempted to have introduced at the hearing in the present case, the entire record in the original case. The court sustained objection made by counsel for respondents. We therefore cannot consider any of the evidence that was presented in the original case. And if it had been introduced in evidence, it would not have been sufficient to prove any acts committed by appellant subsequent to the entry of the decree.

We are unable to hold, upon the record as presented to

us, that appellant was guilty of any act which would justify the order entered by the trial court.

Judgment, in so far as appellants are concerned, is therefore reversed.

MALLERY, C. J., MILLARD, SCHWELLENBACH, and ABEL, JJ., concur.