596 A.2d 687

**ALEXANDER & ALEXANDER, INC., et al.**

v.

**B. DIXON EVANDER & ASSOCIATES, INC.**

No. 1920, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Oct. 4, 1991.

Benjamin R. Civiletti (Nell B. Strachan, Mitchell Y. Mirviss, Venable, Baetjer and Howard, William W. Cahill, Jr. and Weinberg and Green, on the brief), Baltimore, for appellants A & A and Scheeler.

Thomas J. Minton (Quinn, Ward and Kershaw, P.A., on the brief), Baltimore, for appellants Shand, Morahan & Co. and Mut. Fire.

George P. Bowie (Patrick A. O'Doherty, Amy J. Muffolett, O'Doherty, Nead & Hoffman, Edward J. Birrane, Jr. and Birrane, Harlan & Cooke, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and ROSALYN B. BELL and HARRELL, JJ.

WILNER, Chief Judge.

B. Dixon Evander, through a corporation containing his name, operates a general insurance agency in Baltimore.

For many years he was the procurer of medical malpractice insurance for the University of Maryland hospital and most of its medical staff. In 1985, the hospital entered into other arrangements to satisfy its insurance needs, thereby terminating its relationship with Evander. That decision by the hospital and the circumstances surrounding it led Evander to file suit in the Circuit Court for Baltimore City against (1) the hospital,[1] (2) Alexander & Alexander, Inc. (A & A), the insurance broker who replaced Evander, (3) Mary Scheeler, an A & A vice-president, (4) Mutual Fire, Marine & Inland Insurance Company (Mutual Fire), the insurance company that had been procured by Evander, and (5) Shand, Morahan and Company (Shand), the underwriting agent for Mutual Fire.

Evander's action against the hospital and certain of his claims against the other defendants were dismissed during the course of the litigation. Three claims set forth in Evander's third amended complaint were submitted to the jury: Count II, charging that A & A and Scheeler tortiously interfered with a contract between Evander, Shand, and Mutual Fire; Count VIII, charging Shand and Mutual Fire with breach of contract; and Count XIV, charging A & A, Scheeler, Mutual Fire, and Shand with civil conspiracy. The jury returned verdicts in favor of Evander as follows: against all defendants, $250,052 in compensatory damages; against Shand, $70,104 in punitive damages; and against A & A, $40 million in punitive damages.

In post-trial proceedings, the court, by remittitur, reduced the $40 million punitive damage award to $12.5 million, added an agreed amount to the compensatory award, but

---

1. The actual defendant was stated to be the University of Maryland Medical Services Systems, Inc., alleged to include the University's Schools of Medicine, Nursing, Pharmacy, Physical Therapy, and Social Work, as well as the Maryland Institute of Emergency Medical Services Systems (more commonly known as the Shock Trauma unit), and the professional, teaching, non-physician, and non-dental staff employed by those entities. We shall refer to these defendants collectively as the hospital.

otherwise refused to interfere with the verdicts. These appeals ensued in which the defendants present a number of issues and sub-issues directed at each of the claims presented to the jury, at the punitive damage awards, and at the manner in which the case was tried. Evander has dismissed his claim for punitive damages against Shand, and so that is no longer an issue.

## I. THE RELEVANT FACTS

This case took three weeks to try. Much was in dispute. The evidence, viewed in a light most favorable to Evander, the prevailing party, showed the following.

Evander had obtained medical malpractice insurance for the hospital since 1962. In 1975, the insurer for the hospital and indeed for most of the medical community in Maryland, St. Paul Fire & Marine Insurance Company, decided to withdraw from the medical malpractice market in this State and not renew any of its existing policies. *See St. Paul Fire & Mar. v. Ins. Comm'r,* 275 Md. 130, 339 A.2d 291 (1975). In an effort to find replacement insurance, Evander did a great deal of research, telephoning, and travel, including at least one trip to London. He finally was able to negotiate a policy with Mutual Fire, through its underwriting agent, Shand. At that time and at all times relevant to this case, Shand was a subsidiary of A & A, subject to corporate control by it.

The Mutual Fire policy was written on a "claims made" basis, i.e., it covered only claims made while the policy was in force. The insured would therefore be at risk with respect to a claim made after the policy expired, even if the claim was based on conduct occurring during the period the policy was in force. *See St. Paul Ins. Co. v. House,* 73 Md.App. 118, 533 A.2d 301 (1987) *aff'd,* 315 Md. 328, 554 A.2d 404 (1989). In order to protect the hospital against that exposure, Evander negotiated the inclusion in the policy of an Optional Extension Provision (OEP) extending the claims reporting period beyond the expiration of the policy.

The original policy had a three-tiered OEP: the claims period was automatically extended one year; the hospital had an option, for an additional premium, to extend it for two more years; and for a further premium, it had the option to extend the claims reporting period indefinitely.

This three-tiered system, according to Evander, was not a satisfactory arrangement for the hospital, but it was the best he could obtain at the time. Over the succeeding years, however, he pursued negotiations with Shand and, in 1981, was successful in obtaining a better deal. Beginning with the 1981 policy and in the all the renewals thereafter, the OEP (Endorsements 7 and 9) allowed the hospital to extend the claim reporting period indefinitely by paying a one-time premium, upon exercise of the option, equal to 155% of the annual premium for the final year of the policy. The option had to be exercised and the premium had to be paid within 30 days after cancellation or termination of the policy.

Contemporaneously with his obtention of the initial Mutual Fire policy, Evander entered into a producer's agreement with Shand that lies at the heart of this litigation. The agreement, signed in March, 1975, called for Mutual Fire, through Shand, to issue malpractice insurance to Maryland physicians through Evander and to pay Evander commissions of 12.5%, later amended to 8%. It set forth an exclusive arrangement for both Shand and Evander. Paragraph IX obligated Evander to submit all proposals for professional liability insurance for physicians practicing in Maryland exclusively to Shand and, unless the proposal was rejected by Shand, to no one else. In return, Shand agreed "not to accept proposals for professional liability insurance for physicians and surgeons practicing in the state of Maryland from insurance agents or brokers other than [Evander]." The agreement could be terminated by either party upon 90 days written notice but was to remain in effect until so terminated. It was never terminated by written notice.

In 1984, the hospital, which had recently become corporately independent from the University of Maryland, undertook a review of its insurance program and needs. To that end, through a committee created for the purpose, the hospital sent requests for proposals to a number of brokers. The parties appear to agree (although the record extract references cited by them do not support the proposition) that the request required the brokers to bid on a flat fee-for-service basis, rather than on a commission basis. The request also demanded consideration of self-insurance by the hospital.

Six brokers, including Evander and A & A, responded. After reviewing the proposals, the hospital selected A & A as its exclusive broker, confirmation of which came in the form of two letters. The first, dated January 31, 1985, announced "To Whom It May Concern" that, as of that date, A & A had been appointed exclusive broker of record "in all matters relating to property/casualty insurance, including medical malpractice." Its representatives were authorized to negotiate with any insurance company respecting changes in existing policies, including "all policies presently placed with [Mutual Fire] through [Shand]." This letter was intended to allow A & A to gather information and commence negotiations, but not to actually replace any existing policies; it did not provide for any payment to A & A.

The second letter, which was signed a few days later, confirmed A & A's appointment as broker of record but stated that the term of the appointment was to be for one year, commencing July 1, 1985. This letter set forth a broad range of duties for A & A, including the actual procurement of insurance. For these various services, A & A was to be paid a fee of $250,000. Paragraph 6 of the letter, added at the hospital's insistence, provided that: "The fees are intended to replace the commissions associated with procuring insurance. Therefore, all insurance quotations should be obtained net of commission fees. *If this*

*is not possible a credit will be granted in an amount
equal to the commission."* (Emphasis added.)

By virtue of this second letter, Evander would cease to
have any relationship with the hospital as of July 1, 1985.
Evander now accepts that decision and makes no complaint
either as to the hospital's right to make it or to the process
used by the hospital in arriving at it.

The decision by the hospital to place its insurance through
A & A created a problem with respect to the policies issued
by Mutual Fire, for, as noted, Shand had an exclusive
arrangement with Evander and had agreed not to accept
Maryland business through anyone else. At the time, re-
newal of the Mutual Fire policies was still a viable option
under consideration by the hospital, and neither Shand nor
Mutual Fire desired to lose the business. Nonetheless,
although still a subsidiary of A & A, Shand, through Robert
Liston, a vice-president responsible for the hospital's ac-
count, informed A & A and the hospital that it intended to
honor its exclusive agreement with Evander and that it
would not accept the hospital's business through any other
broker.

The manner in which this dilemma was resolved was in
some dispute. Evander produced evidence that, at a meet-
ing then in progress in Scottsdale, Arizona, the top manage-
ment of A & A, including its president, Michael White,
prevailed upon the top management of Shand to reverse its
decision, to remove Liston from further participation, and to
accept hospital policies through A & A unless Evander was
successful in getting the hospital to withdraw its appoint-
ment of A & A within 10 days. This directive was commu-
nicated to both the hospital and Evander. Evander did
indeed attempt to persuade the hospital to reconsider its
decision, but to no avail. In that manner, according to
Evander, A & A gained access to Mutual Fire, through
Shand, notwithstanding the 1975 producer's agreement still
in effect between Shand and Evander.

A & A's appointment did not serve to displace Evander entirely while the existing Mutual Fire policies were in effect, i.e., until July 1, 1985. During the interim, Evander continued to service the policies, handling the billing and adding and deleting persons as they joined or left hospital employ, and A & A began to plan for the period after July 1. A & A and the hospital eventually decided, for reasons not relevant here, not to renew the Mutual Fire policies but to self-insure the basic coverage. That decision, as a practical matter, required the hospital to exercise the OEP provided for in the existing policies. Evander promptly asserted his right to a commission on the premium for that extended coverage, and, when Shand was notified of the hospital's decision not to renew the policies, it informed A & A and the hospital that Evander was entitled to that commission.

An 8% commission on the OEP premium amounted to over $250,000, and A & A perceived that if Evander was entitled to that commission, its fee under the second letter of appointment would be in jeopardy—that is, if the option was exercised on or after July 1, the hospital, under ¶ 6 of that letter, would likely insist on setting off any commission paid to Evander against A & A's fee. Evidence was produced that A & A, largely through Ms. Scheeler, a vice-president with responsibility for the account, then determined to remove Evander entirely from the scene and see to it that no commission was paid to him. Some of this evidence showed an actual and personal animus on her part: she was quoted as having said that "she hates [Evander's] ass and she's going to get [Evander]," and that she intended to put Evander out of business; she spread word that Evander had not done a good job for the hospital and that his accounts should be audited; she falsely accused Evander of improperly collecting from the hospital a State tax on the Mutual Fire premiums when in fact no such tax was ever collected.

It appears, from Evander's evidence, that A & A devised several schemes for circumventing his claim to a commis-

sion on the OEP. As it perceived his claim to be based on the notion that he was the broker of record until July 1 and was currently servicing the policy, A & A decided (1) to cancel the Mutual Fire policies and thus end Evander's relationship with all of the parties on June 1, and (2) to begin servicing the policy itself in the meanwhile. Second, and more significant, it proposed, and forced Shand over its initial objection to accept, a purchase of the OEP through A & A, notwithstanding the exclusivity provision in the producer's agreement, and also to accept a net billing of the OEP premium, i.e., the 155% of the 1984–85 premium *less* the 8% that would have been Evander's commission.[2] On July 16, 1985, A & A billed the hospital for the net premium; the hospital paid that net amount, which A & A then remitted to Shand. This was defended on the ground that A & A had purchased the extended coverage for the hospital as part of its flat fee, and that no commission was due to anyone.[3] There was evidence that, in pursuing this course of conduct, A & A was warned that a net billing arrangement under these circumstances might be regarded as a violation of the Maryland anti-rebating statute, Md.Ann. Code art. 48A, § 226, and that it proceeded nonetheless.

---

**2.** On June 7, 1985, through a letter from Evander's attorney, Shand was put on formal notice of Evander's claim to a commission on the OEP. Perhaps in response to that, it continued to resist A & A's scheme of a net billing. On June 28, Shand's Vice President/General Counsel wrote to Ms. Scheeler, informing her that Shand would issue an endorsement reflecting an early cancellation of the policy and the purchase of the OEP, but that "[t]he endorsement will reflect the gross premium, equalling 155% of the premium for the policy, the 8% commission of the gross buy-out premium and the net premium due." Scheeler was further advised that Shand "will require the gross premium be paid directly to this office on behalf of [Mutual Fire]." Noting the dispute between A & A and Evander, Shand offered to hold the 8% commission in a segregated bank account until the dispute was resolved. The evidence showed that A & A then forced Shand to relent and accept a net premium.

**3.** This "waiver of commissions" theory obviously did not apply to Shand. It collected and retained its commission on the purchase of the OEP.

When, as a result of these transactions, Evander found himself without a commission, he filed this lawsuit. In Count VIII, he sought from Shand and Mutual Fire the commission allegedly due on the OEP pursuant to the 1975 producer's agreement; in Count II, he pursued damages against A & A and Scheeler for tortiously interfering with that agreement and thereby depriving him of the commission; and in Count XIV, he charged the defendants with conspiring to interfere with the contracts and business relationships that he had with the hospital and with Shand and Mutual Fire.

## II. BREACH OF CONTRACT—COUNT VIII

Evander's action for breach of contract was straightforward. He claimed that the 1975 producer's agreement entitled him to an 8% commission on all premiums collected on policies produced by him, that the OEP was a coverage produced by him, and that he was therefore entitled to a commission on that premium. Apart from the contract itself, he produced an expert witness, Edward Siver, who opined that the custom in the insurance industry is that the producer of the policy is the one who is entitled to a commission on an OEP exercised upon termination of the policy and that Evander was the producer of the policy at issue.

Shand/Mutual Fire raise three defenses to this claim. First, they contend that it is barred by limitations; second, they assert that, because Shand was obliged by law to recognize A & A as the hospital's exclusive broker, it owed no commission to Evander and that if anyone did it would be the hospital; and third, they complain that Mr. Siver should not have been allowed to testify as an expert. A & A and Scheeler, who are not directly involved with Count VIII but who assert that Evander had no contractual right to a commission on the OEP as part of their defense of Counts II and XIV, add two other arguments—(1) that the 1975 producer's agreement does not entitle Evander to a commission on the OEP, and (2) even if it did, that agree-

ment was replaced by a 1982 modification and the 1985 agreement with A & A and for those reasons cannot serve as the basis for a commission. Some of these defenses overlap, of course, and those we shall consider together. We are not persuaded by any of them.

### A. *The 1975 Contract*

■ The March, 1975 agreement is in the form of a letter from Shand to Evander which Evander countersigned. The purpose of the letter, as set forth in its first paragraph, is to "state the terms and conditions under which you [Evander] will produce Medical Malpractice Insurance business for which policies will be issued by [Shand] as underwriting agents for [Mutual Fire]." Although not expressly articulated in the agreement, it was clearly implicit that Evander would collect the gross premiums due from the hospital rather than having the hospital pay the premiums directly to Shand or Mutual Fire. That, indeed, is the way the parties proceeded. Paragraph XIII required Shand to render a monthly accounting to Evander summarizing the policies in effect during the preceding month and then obligated Evander to "render payment net of commissions for such policies...." The commission rate, as we said, was originally stated to be 12.5% but, in 1981, was renegotiated to 8%.

The A & A/Scheeler argument is that, because this agreement does not specifically address the OEP, it does not allow a commission on that coverage. They tell us in their brief that, in order for this contract to support Evander's claim "it would have to contain language saying, in substance, that if the insured changed brokers during the policy period, and thereafter exercised the right to purchase the [OEP], only the broker who placed the original coverage would be paid the commission on the purchase of the [OEP]."

We reject that approach. The producer's agreement and the Mutual Fire policy were constituent parts of an overall business arrangement between Evander, on the one hand,

and Shand and Mutual Fire, on the other. The agreement, fairly read, contemplated that Evander would be an exclusive producer of Maryland malpractice policies for Shand and Mutual Fire and that, at least with respect to the hospital account, he would receive the agreed-upon commissions on all premiums emanating from those policies. The OEP was part of the policy produced by Evander. It was, indeed, a critical and integral part of that policy. From the beginning, all parties seem to have recognized the likelihood that the OEP would have to be purchased if the Mutual Fire policies were ever cancelled or non-renewed, and that is why Evander worked so hard to have that provision, in its most liberal form, included in the policy. To suggest that the OEP was a mere appendage for which Evander, as the producer of the policy, was to receive no consideration is to ignore both reality and the evidence. Quite apart from the corroborating testimony of Mr. Siver, the evidence sufficed to show that, under the contract as written, the parties intended that a commission would be due to Evander on the OEP if the option was exercised in accordance with the policy.[4]

### B. *Continuing Effect of 1975 Agreement*

The contention that this intended arrangement was superseded either by a 1981 agreement or by the 1985 broker's agreement with A & A is specious. Although Shand did indeed propose a modification to the 1975 agreement in 1981 that would have superseded that agreement and eliminated the exclusivity provisions, the evidence shows that the 1981 proposal was never put into effect by the parties. Evander signed the draft proposal prepared by Shand subject to a modification which Shand found unacceptable, and the par-

---

4. In its reply brief, Shand adds the argument that Evander cannot rely on the producer's agreement because he breached his commitment under ¶ XIII to guarantee payment of the premium for the OEP. As this point was not raised in the main brief and is not proper rebuttal, we shall not consider it. Had we considered it, we would have found it entirely without merit.

ties continued to do business pursuant to the 1975 agreement.

Evander's right to a commission on the OEP, as we have indicated, arose from an admixture of the 1975 producer's agreement with Shand and the 1975 policy procured by him from Shand/Mutual Fire, as renewed through June, 1985. Neither the appointment of A & A as the hospital's exclusive broker nor the exercise of the OEP after July 1, 1985 can affect that right. The hospital certainly had the right to change brokers; that is not in question. But the appointment of a new broker and the authority given to it to replace existing coverage cannot defeat a contractual right arising from a policy and a producer's agreement already in existence. This, indeed, is the central point either overlooked or ignored by all of the appellants. The OEP was not a new coverage obtained by A & A; it was a coverage obtained, with some considerable effort, by Evander, intended to protect the insureds against liability for conduct occurring *before* July 1, 1985.

Nor can the scheme devised by A & A/Scheeler and acquiesced in by the hospital, Shand, and Mutual Fire of terminating the Mutual Fire policy prior to July 1 and exercising the OEP after that date negate Evander's contractual right to a commission on that extended coverage. Although, in the absence of any supervening law or third-party rights, the parties to an insurance policy may ordinarily terminate the policy whenever they choose, such termination does not necessarily deprive an agent of his right to commissions earned under the policy. As stated in 4 Couch, *Cyclopedia of Insurance Law*, 2d ed., § 26A:224:

"In the absence of a provision in the agency contract to the contrary, the insurer and the insured cannot deprive the insurer's agent of his right to the full commission earned by him in writing the policy through their rescission of the contract, unless such rescission is for some legally sufficient cause from which an agreement to repay the commission would be implied by law."

*See also* 16B Appleman, *Insurance Law and Practice,* § 9001. This is especially the case here, where Evander not only had an exclusive arrangement with Shand but there was evidence showing that the device of early termination was for the principal, if not the sole, purpose of attempting to defeat Evander's claim.[5]

This is not a question, then, as appellants would have us believe, of whether the hospital had a right to change brokers, or even whether Shand was obliged to recognize that change; it is simply a question of whether Evander was entitled to a commission on the OEP because he had procured that coverage and because Shand had agreed to pay a commission on all premiums collected from the policy he procured. The answer is "yes."

### C. *Testimony of Siver*

The court found Mr. Siver to be qualified as an expert in insurance matters, and there was evidence to support that finding. He said that he was familiar with custom and usage in the industry. Despite constant interruptions and objections to nearly every question put to him, Siver was permitted to testify that the custom in the industry is that "the producing agent is the person or the firm entitled to ... any of the commission that's earned and on the policy, yes, the tail" and that Evander was the producer of the policy containing the OEP.

█ Given both the other evidence in the case, including the insurance policy and the producer's agreement itself, and the vigor with which Mr. Siver's qualifications and testimony were attacked, whether this opinion actually contributed much to Evander's case is questionable. In any event, the allowance of expert or opinion evidence is largely within the discretion of the trial court, and we find no abuse of that discretion in this case. The standard to be applied is

---

**5.** This evidence was in dispute. Appellants produced evidence that the Mutual Fire policies were terminated a month early because of a fear that "the price would go up and we wouldn't be able to obtain it."

whether the opinion is likely to be of appreciable help to the trier of fact in deciding the issue before it. This was a complicated commercial dispute involving a huge medical complex, an insurance company, an underwriter, and two brokers, in which a great deal of conflicting evidence and argument was presented. Notwithstanding the harsh and persistent attack upon Mr. Siver's knowledge and qualifications, we cannot say, as a matter of law, that his opinion could not have been of appreciable help to the jury.

## D. *Limitations*

██ We turn, then, to the final defense to Count VIII— Shand/Mutual Fire's claim that it is time-barred. This is based on the notion that the breach of contract claim against Shand and Mutual Fire was first made in the third amended complaint, filed in February, 1990, more than three years after the alleged breach occurred. In pre-trial rulings, the court initially agreed that Count VIII was time-barred and granted summary judgment on that claim but, in response to Evander's motion to reconsider, reinstated the count. The reinstatement was apparently based on the contention that, although the breach of contract claim against Shand and Mutual Fire *was* first made in the third amended complaint, the facts on which the claim was based were asserted in the second amended complaint, which was filed within the limitations period, and that Evander was therefore entitled to a "relation back" to the date the second amended complaint was filed.

The law in this regard was well stated in *Crowe v. Houseworth*, 272 Md. 481, 485–86, 325 A.2d 592 (1974):

"A frequently encountered problem, which is the result of the more liberal use of amendments, is whether a new action has commenced, an action which may be barred by limitations, or whether the doctrine of relation back is applicable: that is, whether the assertion of the original complaint tolled the running of the statute. The modern view seems to be that so long as the operative factual situation remains essentially the same, no new cause of

action is stated by a [complaint] framed on a new theory or invoking different legal principles. As a consequence, the doctrine of relation back is applied, and the intervention of a plea of limitations prevented."

As is the case with so many legal tests or standards, this one is easier to state than to apply. What is the "operative factual situation?" In *Kirgan v. Parks,* 60 Md.App. 1, 478 A.2d 713 (1984), we drew from *Cline v. Fountain, Etc., Company,* 214 Md. 251, 261, 134 A.2d 304 (1957), the notion that "if evidence which would support the amended [complaint] would support the original, that is, if judgment for the plaintiff on the amended [complaint] would bar suit on the original, the amendment does not set forth a new cause of action and, therefore, is not barred by limitations." *See also Priddy v. Jones,* 81 Md.App. 164, 567 A.2d 154 (1989), but *compare Morrell v. Williams,* 279 Md. 497, 366 A.2d 1040 (1976).

The second amended complaint was filed in February, 1988, clearly within three years after the foundational events of June and July, 1985. Unlike the gravamen of the third amended complaint, which centers on the producer's agreement with Shand, the thrust of the second amended complaint was that the denial of commissions to Evander on the OEP constituted a breach of contract between Evander and the *hospital,* and the hospital was sued for breach of that contract. The counts against Shand, A & A, and Mutual Fire rested on the charge that their conduct constituted an improper interference with the relationship Evander had with the hospital; they were sued for malicious interference with the alleged contract itself and with the overall business relationship between Evander and the hospital.

In pleading those actions, however, Evander did allege that he also had a contract with Shand that was violated. In ¶ 24, he averred that under contractual agreements with Shand, Mutual Fire, and the hospital, he was entitled to commissions on all premiums collected from the hospital under the Mutual Fire policies, including premiums paid to

effectuate the OEP coverage; in ¶¶ 26 and 34, he alleged that he performed his obligations under those agreements; and in ¶ 75, he claimed that, as a result of intentional interference by Shand and Mutual Fire, he did not receive the commission on the OEP that he had earned and that was legally due him.

To the extent that the "operative factual situation" refers to the basic relationships among the parties and the conduct of the defendants, there is a sufficient similarity here to permit relation back. It is no doubt true, as Shand asserts, that *some* more particular facts had to be proved to sustain Count VIII that would not have had to be proved to sustain the counts pled in the second amended complaint, and thus the evidence presented to prove the one would not have been identical to that needed to prove the other. But *identity*, either in facts or in evidence, is not required. Different legal theories often require some different facts to be proved. The important operative facts for purposes of Count VIII were that Evander had a contractual right to the commission from Shand and that Shand refused to pay the commission without just cause. Those facts were also alleged in the second amended complaint, albeit in a somewhat scattered fashion.

For these reasons, we find no fault with the award of compensatory damages on Count VIII.

## III. INTERFERENCE WITH CONTRACT—COUNT II

In Count II, Evander charged A & A and Scheeler with maliciously interfering with Evander's contractual right under the producer's agreement with Shand to a commission on the OEP. Those defendants effected that interference, he contended, by inducing the hospital to pay, through A & A, a net premium exclusive of the 8% commission and by A & A, as the parent corporation, causing Shand to accept that premium from A & A and then decline to pay a commission to Evander. This scheme, he alleged, constituted a violation of the Maryland anti-rebating statute, Md. Ann.Code art. 48A, § 226. The court instructed the jury on

the several elements of the tort and read to them the anti-rebating statute, whereupon the jury, in special verdicts, found that A & A and Scheeler *had* maliciously interfered with that contract and, as a result of that interference, Evander was deprived of the commission.

In this appeal, A & A/Scheeler make two complaints with respect to Count II—first, that Evander failed to prove a contract entitling him to the commission, and second, that if there was such a contract, A & A and Scheeler were privileged to interfere with it and the court should have instructed the jury on privilege. We have already rejected the first of these complaints, and we now declare no merit in the other.

■■ The privilege defense is based on the hypothesis that Evander lost his right to the commission because he was replaced as the hospital's broker and that A & A was privileged to compete for that position and to try to persuade the hospital to choose it over Evander. It is true, of course, that "lawful competition must be sustained and encouraged by the law," *Knickerbocker Co. v. Gardiner Co.*, 107 Md. 556, 566, 69 A. 405 (1908), and that A & A was therefore privileged to take all lawful steps in an effort to supplant Evander as the hospital's exclusive broker. But that is not the nature of Evander's complaint; nor was it the basis of the jury's verdict. The jury found from the evidence, not improperly in our view, that Evander's right to a commission on the OEP arose from existing contracts— the 1975 policies, as annually renewed through June, 1985, and the producer's agreement with Shand. Evander's replacement by A & A as the exclusive broker—the object of the competition—did not and could not, of itself, serve to deprive Evander of his right to that commission. It might abrogate his right to any commission emanating from any new or renewed policy acquired after the termination of his agency status (*cf. C & P Telephone Co. v. Murray*, 198 Md. 526, 84 A.2d 870 (1951)), but it could not affect a right that he already had.

■ The complaint made in Count II was that A & A and Scheeler deliberately and maliciously interfered with that existing contractual right by (1) causing the hospital to remit, through A & A, a net premium and (2) exercising A & A's corporate control over Shand to cause it to accept that net premium and then decline to pay Evander the commission. In presenting their privilege defense, A & A/Scheeler do not deny that they did these things; they simply say they were entitled to do them. They were not so entitled.

The law in this regard was succinctly restated in *Sharrow v. State Farm Mutual,* 306 Md. 754, 765, 511 A.2d 492 (1986):

"It is thus clear from our cases that even though a third party may for his own benefit intentionally induce one party to terminate a contract with another, this alone will not render him liable in an action for tortious interference if he had a right to cause the breach since, in such circumstances, the conduct would not be wrongful or improper. [citations omitted] But if the party causing the breach acts solely to benefit himself, or to cause injury to another, without a right to so act, such conduct is improper and may subject the party to liability for the injury suffered."

As we indicated earlier in this Opinion, there was evidence showing that A & A perceived a self-interest in depriving Evander of the OEP commission—a concern that the hospital would set that commission off against A & A's flat fee compensation. This was not, then, a matter of competing for business, but rather a question of maximizing its own gain. There was also evidence that, when Evander learned of what was afoot and began to protest and insist on his right to the commission, Scheeler and A & A began to act not just in self-interest but also out of animus, in an effort to hurt Evander. A finding as to either motive would justify a verdict for compensatory damages under Count II.

## IV. CIVIL CONSPIRACY—COUNT XIV

### A. *Nature of the Claim*

Count XIV charged the defendants with having conspired with one another and with the hospital "to interfere with contracts between Evander and Shand and Mutual Fire, to interfere with economic relations between Evander and the [hospital], to interfere with economic relations between Evander and Shand and Mutual Fire, to convert monies lawfully due to Evander, to commit fraud, non-disclosure and concealment of material and pertinent facts to the detriment of Evander on which Evander materially and substantially relied to his detriment." This rather broad complaint was considerably narrowed during the trial; the special verdict sheet given to the jury simply asked whether A & A and Scheeler entered into a conspiracy with Shand and Mutual Fire "to deprive Evander of commissions due under his contract" and, if so, whether Evander lost the commission "as a direct and proximate result of the conspiracy."

The civil conspiracy rested essentially on the same evidence relied upon by Evander to prove his other charges, but, in an effort to show that the defendants used unlawful means to achieve their objective, he asserted that the scheme of billing the hospital for the OEP premium net of commissions and having Shand accept that net premium constituted, under the circumstances, a violation of the anti-rebating statute. To that end, evidence concerning the statute was admitted and the statute was read to the jury as part of the court's instructions. Focusing on that, the defendants argue that (1) the statute was not applicable because Mutual Fire was a surplus lines, non-admitted insurer, (2) even if it were applicable, it is enforceable only by the Insurance Commissioner and therefore cannot be the subject of a civil conspiracy or give rise to a private cause of action, and (3) even if applicable and enforceable in a civil action for damages, it was not violated.

In a footnote to their argument with respect to the anti-rebating statute, A & A/Scheeler throw in the additional assertion that no conspiracy is possible between A & A and Scheeler, its employee, or between A & A and Shand, its wholly owned subsidiary. The relegation of this argument to a footnote to a wholly different point accords the argument its proper value. Even assuming the validity of the two propositions,[6] the fact is that the conspiracy charged under Count XIV did not rest just on concerted action by A & A, Scheeler, and Shand. That count alleged that Mutual Fire and the hospital were also part of the conspiracy, and the evidence sufficed to show significant participation by

---

**6.** In *Harnish v. Herald–Mail Co.*, 264 Md. 326, 337, 286 A.2d 146 (1972), the Court held that "[i]t is doubtful at the least that an employee of a corporation and that corporation can conspire where the employee is acting only for the corporation and not for any personal purpose of his own." Here, as noted, there was some evidence that Ms. Scheeler developed a personal animus of her own against Evander; thus, the jury might have found that her conduct was impelled by a "personal purpose of [her] own" and was not "only for the corporation." *See also Marmott v. Maryland Lumber Co.*, 807 F.2d 1180 (4th Cir.1986), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 700 (1987). At the defendants' request, the jury was instructed that a corporate officer or employee "acting on behalf of a corporation" cannot conspire with the corporation.

As to whether a corporation can conspire with its wholly owned subsidiary, the law is not entirely clear. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the only case cited by A & A/Scheeler, the Supreme Court held that concerted activity between a parent and a subsidiary would not give rise to liability under § 1 of the Sherman Act. *Copperweld* dealt exclusively with that section of the Sherman Act and considered whether concerted action between parent and wholly owned subsidiary had any different anti-competitive effect than concerted action among officers and employees of a unitary firm or between unincorporated divisions of a corporation. The courts seem to be divided as to whether non-recognition of concerted action between parent and subsidiary extends beyond the anti-trust context. *Compare Metro. Life Ins. v. La Mansion Hotels*, 762 S.W.2d 646, 652 (Tex.App.1988), *Haroco v. American Nat. B. & T. Co. of Chicago*, 747 F.2d 384, 403 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), and *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir.1989) with *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F.Supp. 1154, 1165–66 (D.Kan.1990), and cases cited therein.

the hospital in the concerted effort to deprive Evander of his commission.

■ It is true, of course, that the hospital had been dismissed as a defendant in the action, but the law permits a plaintiff to recover against any one or more of the conspirators without naming them all as defendants. *See Kimball v. Harman,* 34 Md. 401, 409–10 (1871); *Sayadoff v. Warda,* 125 Cal.App.2d 626, 271 P.2d 140 (1954); *Rood v. Newman,* 74 Ga.App. 686, 41 S.E.2d 183 (1947); *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 27, 99 L.Ed. 644 (1954); *Driscoll v. Burlington–Bristol Bridge Co.,* 8 N.J. 433, 86 A.2d 201, *cert. denied,* 344 U.S. 838, 73 S.Ct. 25, 33, 97 L.Ed. 652 (1952); *Burton v. Dixon,* 259 N.C. 473, 131 S.E.2d 27 (1963); *C. Hayman Construction Co. v. American Indemnity Co.,* 473 S.W.2d 62 (Tex.Civ.App.1971); *Lyle v. Haskins,* 24 Wash.2d 883, 168 P.2d 797 (1946); *Nailor v. Western Mortgage Company,* 54 Wash.2d 151, 338 P.2d 737 (1959); *Rose Hall, Ltd. v. Chase Manhattan Overseas Bank,* 494 F.Supp. 1139 (D.Del.1980); 15A C.J.S. *Conspiracy* § 23, p. 668; 16 Am.Jur.2d *Conspiracy* § 66, p. 278.[7] We turn, then, to the question of the anti-rebating statute.

---

7. This seems to have been overlooked entirely by the defendants when framing their requests for jury instructions. A & A/Scheeler requested an instruction that, to prevail on his claim, Evander had to show that A & A, Scheeler, Mutual Fire, and Shand "entered into an agreement to accomplish an unlawful act or to use lawful means to accomplish an act not in itself illegal, and that the act or means employed resulted in damage to Evander." Shand and Mutual Fire requested a similar instruction. The court, unfortunately, did not give those requested instructions, or indeed anything similar to them, although their essence was stated on the special verdict sheet given to and returned by the jury. The defendants do not complain in this appeal about the court's failure to give the requested instruction on civil conspiracy, however. The point is that neither the requested instructions nor the special verdict sheet addressed the role of the hospital; they neither required nor precluded consideration by the jury of the hospital's participation in any concerted effort by the defendants to deprive Evander of his commissions. Yet the role of the hospital was clearly an issue in the case and a great deal of evidence was presented with respect to it.

## B. *The Anti–Rebating Statute*

The anti-rebating statute is part of the subtitle of the Insurance Code defining and prohibiting unfair methods of competition and trade practices. Section 213 of art. 48A declares broadly that *"[n]o person* shall engage in this State in any trade practice which is defined in this subtitle as, or determined pursuant to this subtitle to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." (Emphasis added.) Section 214 defines as an unfair method of competition and unfair and deceptive practice "[t]he commission of any one or more of the acts prohibited by §§ 217 to 234, inclusive."

Section 226, the one in point here, contains four provisions relevant to this case. Subsection (a) provides, in relevant part:

> *"No insurer* or any employee or representative thereof, and no agent or broker shall pay, allow, or give, directly or indirectly, as an inducement to insurance, *or after insurance has been effected,* any rebate, discount, abatement, credit or reduction of the premium named in the policy of insurance ... except to the extent provided for in an applicable filing with the Commissioner as provided by law."

(Emphasis added.)

Subsection (b) prohibits an insured from knowingly accepting such a rebate, discount, abatement, credit, or reduction. Subsection (c) prohibits insurers from making any unfair discrimination between insureds or property having like insuring or risk characteristics in the premiums or rates charged for insurance. Subsection (d) exempts from the section "the payment of commissions or other compensation to duly licensed agents or brokers" and the returning to participating policyholders of "lawful dividends, savings or unabsorbed premium deposits."

A proper reading of this statute in light of the evidence produced by Evander reveals the fallacies in the several arguments posited by the defendants.

## C. *Applicability of the Statute*

■ There can certainly be no doubt that the statute applies to A & A and Shand; indeed, they do not argue otherwise. Nor is Mutual Fire excluded because it is a surplus lines carrier. Such carriers are exempt from *some* regulation by the Insurance Commissioner, but they are not exempt from all regulation (*see* art. 48A, §§ 183–199), and we see no basis for concluding that they are exempt from § 226. Subsection (a), as noted, states that "[n]o insurer" shall engage in the prohibited practices. The term "insurer" is defined in § 3 of the article as including *"every person* engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance." (Emphasis added.) There is no exclusion in either the definition or the substantive provision for non-admitted companies; nor, given the purpose of the provision, should one be read into it. Ignoring that, Mutual Fire looks to the clause in subsection (a) allowing special benefits to be given "to the extent provided for in an applicable filing with the Commissioner," and argues from it that, as the statute references a filing with the Commissioner, it must apply only to companies required to make such a filing. That, of course, is nonsense. The proscribed act is prohibited unless it is permitted in a filing approved by the Commissioner; if there is no filing, it remains prohibited. All of the defendants are therefore subject to the statute.

## D. *Relevance of the Statute*

We turn then to the argument that a civil conspiracy cannot rest upon a violation of § 226 because that statute is in the nature of a trade regulation, the enforcement of which is committed exclusively to the Insurance Commissioner, subject to limited judicial review. The underpinning of this argument is that (1) a civil conspiracy requires proof of some "illegal act," which itself would be actionable; (2) the illegal act alleged by Evander was a violation of § 226, and (3) § 226 creates no private right of action and therefore cannot serve as the requisite illegal act.

■ The Court of Appeals defined the tort of civil conspiracy most clearly and succinctly in *Green v. Wash. Sub. San. Comm'n,* 259 Md. 206, 221, 269 A.2d 815 (1970) as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." From this, we noted in *Beye v. Bureau of National Affairs,* 59 Md.App. 642, 658–59, 477 A.2d 1197 (1984), that "[r]equisite to establishing a conspiracy, then, is a showing that the object of the agreement is *either* an unlawful act or a lawful act to be accomplished by unlawful means." (Emphasis added.)

■ The Maryland law is clear that the "unlawful" act or means required for a civil conspiracy need not be criminal in nature. *Columbia R.E. Title Ins. Co. v. Caruso,* 39 Md. App. 282, 288, 384 A.2d 468 (1978). Rather, as noted in *Debnam v. Simonson,* 124 Md. 354, 92 A. 782 (1914), *Knoche v. Standard Oil Co.,* 138 Md. 278, 113 A. 754 (1921), and *Goldman v. Building Assn.,* 150 Md. 677, 133 A. 843 (1926), the act (or means) need only be "of such a character as to create an actionable wrong." *Knoche* [138 Md.] at 282, 113 A. 754. In *Van Royen v. Lacey,* 262 Md. 94, 277 A.2d 13 (1971), the Court held that the fraudulent conveyance of a debtor's property would suffice as an unlawful means of depriving a creditor of an ability to collect a judgment against the debtor and thus, had the creditor suffered any loss as a result of it, would support a civil conspiracy when the conveyance was part of a concerted effort by two or more people to achieve that result.

■ There is no doubt that Evander pushed "to the hilt" his claim that the net billing scheme concocted by the defendants constituted a violation of § 226, and, for purposes of this appeal, we shall assume, without deciding, that § 226 was intended by the Legislature to constitute a governmental trade regulation enforceable principally by

the Insurance Commissioner, subject to limited judicial review, and not to create a private right of action.[8] It seems clear, however, from both the third amended complaint and the verdict sheet, that the statutory violation was neither asserted nor submitted to the jury as the basis of Evander's cause of action. It was not portrayed as the unlawful object of the conspiracy, which consisted instead of the tortious interference with Evander's contractual right to a commission, but rather as part of the means used by the defendants to achieve that unlawful objective. In hindsight, it was not necessary for that purpose; if, as turned out to be the case, Evander was successful in proving that

---

8. Section 226, as noted, is part of a whole subtitle of the Insurance Code defining and prohibiting Unfair Trade Practices. The subtitle, first enacted in 1947, was based on the Model Unfair Claims Practices Act drafted and proposed by the National Association of Insurance Commissioners and was intended to preserve State control over the insurance industry. By the McCarran–Ferguson Act (15 U.S.C. § 1012), referenced in § 212 of art. 48A, Congress declared generally that the business of insurance was subject to State law and provided specifically that certain Federal anti-trust Acts, including the Federal Trade Commission Act, would apply to the business of insurance only "to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b). In interpreting various provisions of the Code, most, though not all, States have concluded that those provisions were in the nature of governmental regulations and did not create private rights of action. *See,* for example, *Morris v. American Family Mut. Ins. Co.,* 386 N.W.2d 233 (Minn.1986); *Moradi–Shalal v. Fireman's Fund Ins.,* 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988); *D'Ambrosio v. Pa. Nat. Mut. Cas. Ins. Co.,* 494 Pa. 501, 431 A.2d 966 (1981); *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.,* 798 F.2d 669, 675 (4th Cir.), *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1302, 94 L.Ed.2d 158 (1986), construing Virginia law. We followed that approach with respect to § 230A in *Johnson v. Federal Kemper Ins.,* 74 Md.App. 243, 536 A.2d 1211 (1988). No case has been cited to us in which a court took that position with respect to a counterpart of § 226. We do note that § 12 of art. 48A provides that the
> "willful violation of any provision of this article, with respect to which violation a greater penalty is not provided by other applicable laws of this State shall, in addition to any administrative penalty otherwise applicable thereto, upon conviction in a court of competent jurisdiction of this State be punishable by a fine of not more than [$100,000]."

It would appear, then, that a willful violation of § 226 carries criminal as well as administrative penalties.

the defendants reached and implemented an agreement to deprive him of a commission and that such deprivation constituted a tortious interference with his contract, he would not need to prove as well that the means used to implement the agreement were themselves unlawful. The tortious interference would itself be an unlawful act. But that would not make evidence of a statutory violation irrelevant. It could bear on the nature of the agreement, the intent of the parties, and, considering the fact that they were warned in advance that the ne premium scheme might constitute a violation of the statute coupled with the administrative and criminal sanctions imposable for such a violation, the extent to which they were willing to go to achieve their objective.

Viewed in this light, it is not important whether § 226 creates or allows a private right of action for its violation. Evander was not seeking to recover simply for a violation of the statute. Although there is authority for the proposition that a civil conspiracy cannot rest solely upon the violation of a statute that creates no private right of action (*see City and County of San Francisco v. United States*, 443 F.Supp. 1116, 1129 (N.D.Cal.1977), *aff'd*, 615 F.2d 498 (1979)), no case has been cited to us, and we know of none, holding that a regulatory statute enforceable only by an administrative agency or by criminal prosecution cannot be considered in determining the existence or the nature of a civil conspiracy. Because Evander was not using the statute as the basis of his claim, there is no problem here of a failure to exhaust administrative remedies available under the statute. Moreover, as the jury was not asked specifically to determine whether the statute *had* been violated and because a violation was not a requisite element of the claim, we do not see that its injection into the case created any danger of interference with the authority and discretion given to the Commissioner or the State's Attorney. *Compare Silkworth v. Ryder Truck Rental*, 70 Md.App. 264, 520 A.2d 1124, *cert. denied*, 310 Md. 2, 526 A.2d 954 (1987).

### E. *Violation of the Statute*

 We turn, then, to the final argument as to the statute—that the evidence failed to show that it was violated. A & A/Scheeler argue that "[t]he two hallmarks of an illegal rebate are (1) discrimination between premiums charged identical policyholders, and (2) offering the 'rebate' to induce the purchase." Neither, they contend, was established here. The hospital policy, they say, was unique, and so there were no identical policyholders upon whom discrimination could be practiced. Moreover, they urge that, because the commission for the OEP was built into A & A's flat fee, the net premium arrangement did not constitute an inducement.

As we have just indicated, the jury was not specifically asked to determine whether the statute was violated and it returned no special verdict on that matter. Nevertheless, we need to address these arguments, because if the evidence failed to show any basis for a finding that the statute was violated, its injection into the case would have been improper. That, however, was not the case. Both of these arguments are based on an unduly narrow reading, and thus a misconstruction, of the statute.

Section 226 is not aimed just at discrimination between identical policyholders. Subsection (c) addresses that evil; it specifically prohibits an insurer from unfairly discriminating "between insured or property having like insuring or risk characteristics, in the premium or rates charged for insurance." Subsection (a) is the part dealing with rebates. It prohibits an insurer, among other things, from giving any "reduction of the premium named in the policy of insurance" unless provided for in a filing with the Commissioner. The premium for the OEP coverage was stated in the policy; it was to be 155% of the last annual premium, which included an 8% agent's commission. That was what the hospital was obligated to pay under the policy if, upon termination, it elected to purchase the optional coverage. Under the arrangement with Shand, Evander was to collect that premium, deduct his commission, and remit the bal-

ance. A & A did not collect the stipulated premium from the hospital; it collected less and deducted nothing.

The second strand of A & A/Scheeler's argument ignores the plain wording of § 226(a). It does not prohibit a rebate only when given as an inducement to insurance but also when given "after insurance has been effected."

For all of these reasons, we find no error in the verdict rendered on Count XIV.

## V. CONDUCT OF THE TRIAL

A & A/Scheeler's final complaint, other than as to punitive damages, is that "the record in this case shows outrageous and insulting behavior, without restraint by the trial judge, who did not moderate or govern the proceedings properly." In an earlier brief, appellants attempted to call our attention to some of this alleged behavior through an appendix. We struck that brief and appendix, however, because (1) the matter included in the appendix was wholly inappropriate for an appendix, and (2) with that appendix, the brief far exceeded the 35-page maximum provided for in the Maryland Rules. In the brief now before us, appellants document this rather serious charge with only two references to the record, one where they claim that Evander's attorney was permitted to impeach Evander with his deposition testimony and the other where they contend that the attorney was permitted to ask a question as to a purely legal issue. We have examined the passages cited; suffice it to say that, if limited to them, the complaint would be wholly frivolous.

In a reply brief, A & A/Scheeler attempt to call our attention to a number of other instances where they claim that one of Evander's attorneys, Mr. O'Doherty, made inappropriate remarks during the trial or repeated improper questions. Apart from the fact that these further references should have been included in the main brief and are not really in the nature of rebuttal, they do not support the underlying contention that the trial was so out of control as

to require reversal. Most of the remarks now complained of were not objected to at the time, and in those instances where objections *were* made, the court generally sustained the objection. We therefore find no reversible error.

■■■ That said, it is apparent to us that the attorney did, throughout the trial, exceed the bounds of gentlemanly (and ladylike) conduct and decorum that ought to govern the practice of law in general and courtroom proceedings in particular. This was not a criminal prosecution, and it was therefore wholly inappropriate to accuse A & A of "theft," or "stealing," or "robbery." There is no need for snide remarks, pejorative, and unfounded hyperbole or exaggeration, and they should not be permitted. The search for truth, which is supposedly the principal function of a trial, is assisted much more by light than by heat. We remind counsel that, under the Rules of Professional Conduct, they are not to use the law's procedures to harass or intimidate others but are to demonstrate respect for the legal system and those who serve it. *See Preamble: A Lawyer's Responsibilities.* We also remind judges of their obligation under Canon 3 of the Code of Judicial Conduct to "maintain order and decorum in proceedings before the judge."

## VI. PUNITIVE DAMAGES

### A. *Introduction*

As we observed, only three of the 14 counts pled in the third amended complaint were submitted to the jury—Count VIII, charging Shand and Mutual Fire with breach of contract, Count II, charging A & A and Scheeler with tortious interference with contract, and Count XIV, charging the four defendants with conspiracy. Count VIII asked only for compensatory damages; punitive damages of $5 million were sought in the other two counts. In Count II, Evander claimed that A & A and Scheeler acted willfully, maliciously, and intentionally, with full knowledge that their acts were wrongful and without legal justification. No such allegation was made in Count XIV.

Upon the close of all the evidence, Evander sought leave to increase his claim for punitive damages to $20 million. Initially, the court allowed an increase to $15 million but then reconsidered and permitted an increase only to $10 million. The $40 million award against A & A and Scheeler clearly was not within that request. In post-judgment proceedings, however, the court, through remittitur accepted by Evander, reduced the $40 million award against A & A to $12.5 million and permitted an increase in the *ad damnum* to that amount.

A & A makes but one complaint about the judgment for punitive damages—that, because of its amount and because the remitted award bears no relation to "proper standards," it violates both Federal and State requirements for due process of law. This argument is premised on the recent decision of the United States Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

The issues presented by *Haslip* are complex, in part because of the instructions that were requested and given (and not requested or given) in this case and in part because the Maryland law and procedures governing punitive damage awards themselves need revisiting in light of that case.

### B. *Preservation*

Although *Haslip* had not been decided, or even argued, when this case was tried, the notion that punitive damage awards might be subject to both substantive and procedural due process constraints was certainly current. Apart from the growing law review literature, the Supreme Court itself had indicated the prospect in *Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), noting that due process might act as a check on undue jury discretion in the absence of any statutory limit and that a punitive damage award might not pass muster under the due process clause if it was the product of bias or passion or reached in proceedings that lacked the basic elements of fundamental fairness. *Id.*, 109 S.Ct. at

2921. Moreover, although declining the invitation to craft on its own "some common-law standard of excessiveness that relies on notions of proportionality between punitive and compensatory damages," it abstained because "these are matters of state, and not federal, common law," thereby suggesting that the State courts were competent to devise such a standard to complement, or gratify, due process limitations. *Id.* at 2922.

Notwithstanding the appearance of these possible circumscriptions on the horizon, no request was made by A & A for instructions setting forth any standard for the determination or calculation of punitive damages or for any limit on the amount. The only instruction on punitive damages sought by that defendant would have defined actual malice, more or less as the court in fact defined it, stated that a mere desire by A & A to realize commercial gain at Evander's expense does not "without more" constitute actual malice, and declared that punitive damages could not be awarded if A & A's wrongful acts were done "in the honest assertion of a supposed right or in the discharge of a duty" or if it acted merely to benefit itself, without evil or hate toward Evander.

Although some of the elements contained in the proposed instruction were included or implicit in an instruction given with respect to Shand and Mutual Fire, that instruction was specific as to those two defendants. A separate instruction with respect to A & A was not given, and so, in effect, no instruction was given to the jury regarding punitive damages against A & A.[9] A very brief, but nonetheless effec-

---

9. The only instructions given with respect to punitive damages were as follows:

"You cannot award punitive damages against Shand or Mutual Fire if you find that they merely breached a contract with Evander. However, if you also were to find that Shand and Mutual Fire have committed a tortious action in addition to a breach of contract, you may, but you are not required to consider an award of punitive damages against them. In that case, punitive damages may be awarded only if you find that Shand and Mutual Fire committed tortious acts with actual malice."

tive, exception was taken to the court's failure to give the proposed instruction. As noted, however, A & A does not complain in this appeal about the court's failure to give its proposed instruction; its complaint rests solely on the lack of any standard to guide either the jury or, later, the court. *That* objection was first made in A & A's motion for judgment NOV or new trial, filed after the verdict was rendered, and even then no specific standard was suggested. In an accompanying memorandum, A & A complained about the amount of the award, asserting that the function of punitive damages was to punish the wrongdoer and deter others from engaging in similar conduct and urging that "[a]n award of $40 million (160 times the compensatory award) in a case of first impression, with no established legal principles for guidance ... will do little to deter future conduct." Still, although the prospect of a remittitur was certainly real, no standards were suggested to guide the court in deciding on an appropriate reduction. Indeed, as to amount, counsel was about as arbitrary as he now complains the court was, arguing that "under all the circumstances here, that Your Honor's authority to remit should be exercised to $5 million." [10]

The judge was obviously not unmoved by A & A's plea, as he reduced the punitive damage award by $27.5 million

---

Earlier in its instructions, the court defined "actual malice" as existing

"if the conduct complained of was performed in such a way and under such circumstances as to show that it was without legal justification or excuse, and it was also influenced or motivated by hatred or spite and was performed in order to intentionally or deliberately injure or cause loss to another person."

**10.** Upon A & A's motion, we ordered that the transcript of that proceeding, which was not included in the record initially transmitted to this Court, be added to the record. It is therefore properly before us. Because the record extract in this case already comprises nearly 4200 pages, we denied a motion to reprint the transcript in a supplemental record extract, preferring instead to refer to the original. Despite the fulmination of appellee's counsel at oral argument, we have the right to do that. Md. Rule 8–501(a) provides that "[u]nless otherwise ordered by the appellate court," the appellant shall prepare a record extract in accordance with the Rule.

(over 68%). Before doing so, he said that he had read not only "all of the court records" but "every piece of material that was submitted by both the plaintiffs and defendants." He acknowledged that the $40 million verdict shocked his conscience, noting that at no time had Evander ever sought more than $20 million. He explained his ultimate decision thusly: "[T]hroughout the hearings of the [post-trial motions], I indicated that I felt that the judgment should be somewhere between $10 million and $15 million. The latest request of the plaintiff prior to arguing the case before the jury was an increase [to] $12.5 million." He later observed: "I realize that we are dealing in large sums of money and this case has given this Court many headaches and many hours of research and it's very important that a ruling in this matter be made which is fair and reasonable under all circumstances."

On this record, we could well conclude that A & A effectively waived its right to make the due process complaint it now presents to us. As we observed, although *Haslip* itself had not been decided when the case was tried, the principles enunciated in that case were not pulled out of the ether; they abounded in the literature, had been raised, though not decided, in earlier decisions of the Supreme Court, and were even then being presented to courts and juries throughout the country. Indeed, the *Haslip* Court itself noted that "[t]he constitutional status of punitive damages ... is not an issue that is new to this Court or unanticipated by it." 111 S.Ct. at 1040. If A & A was concerned about unbridled jury discretion, it should have expressed that concern to the court and suggested the standards and limits it thought appropriate before the case was submitted to the jury. If it was concerned about unbridled judicial discretion, it should have suggested appropriate standards and limits to the court in its post-trial motion and not just recommended an equally arbitrary number.

Notwithstanding these omissions, given the size of the punitive award, even as remitted, the amount of the com-

pensatory award, the nature of the conduct upon which those awards were based, and the fact that, under *Haslip*, both the amount of punitive awards and the procedure for their determination are now clearly subject to due process constraints, we shall exercise the discretion accorded to us under Md. Rule 8–131(a) and consider A & A's contention.

### C. *Haslip*

*Haslip* emanated from a group health and life insurance arrangement among an Alabama municipality, its employees, and one Ruffin, an agent for Pacific Mutual. Under the arrangement, Pacific Mutual was to issue the life insurance policy and Union Fidelity Life Insurance Co. was to issue the health policy. The premiums for both policies were deducted by the City from the employees' paychecks and remitted to Ruffin at Pacific Mutual's local office; he was to forward them to the insurers. Ruffin misappropriated the premiums due to Union Fidelity, however, whereupon the company cancelled the health policy, sending notice to the employees in care of Ruffin. Ruffin never forwarded the notice of cancellation. A number of employees, including Haslip, later incurred medical expenses that would have been covered under the Union Fidelity policy, and, when Ruffin's misdeeds were revealed, they sued both him and, under a *respondeat superior* theory, Pacific Mutual. Ms. Haslip received a general verdict of $1,040,000, of which at least $840,000 the Court attributed to punitive damages. Pacific Mutual appealed, contending that, "as the product of unbridled jury discretion," the punitive damages were violative of due process.

The Court began its analysis by iterating the observation made in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984) that "[p]unitive damages have long been a part of traditional state tort law." Under the "traditional common-law approach," which the Court assumed was applicable in most of the States, "the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and

the need to deter similar wrongful conduct" and "[t]he jury's determination is then reviewed by trial *and appellate* courts to ensure that it is reasonable." *Id.* [111 S.Ct.] at 1042 (emphasis added). That method, the Court confirmed, does not itself violate due process. But, the Court quickly added, "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 1043.

The Court declined to draw a "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case" but observed instead that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." On that premise, it examined three aspects of the award: the instructions given to guide the jury in determining whether and how much to award, judicial oversight or review of the verdict, and the amount itself. As to the first aspect, the Court noted that the jury was informed that the purpose of punitive damages was to punish the defendant and to deter others from engaging in similar conduct and that, in deciding whether to award such damages, it was to consider the character and degree of the wrong and the need for deterrence. These instructions, the Court held, "thus enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory." *Id.* at 1044. Accordingly, they "reasonably accommodated" both the defendant's interest in rational decision-making and the State's interest in "meaningful individualized assessment of appropriate deterrence and retribution." *Id.*

The Court then observed that under Alabama law (*Hammond v. City of Gadsden,* 493 So.2d 1374 (1986)), trial courts were required to state in the record reasons for interfering or not interfering with jury verdicts on the ground of excessiveness, and that, among the factors the

court could consider were the culpability of the defendant's conduct, the desirability of discouraging others from similar conduct, and the impact on the parties and on innocent third parties. Moreover, the Alabama Supreme Court itself reviewed punitive awards to assure that they do "not exceed an amount that will accomplish society's goal of punishment and deterrence." *Id.* [111 S.Ct.] at 1045. In the particular case, the Alabama court had reviewed the award in light of several specific standards: whether there was a reasonable relationship between the award and the harm accruing from the defendant's conduct, the degree of reprehensibility of the defendant's conduct, the duration of that conduct, any concealment, the existence and frequence of similar past conduct, the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and having the defendant sustain a loss, the defendant's financial position, the costs of litigation, and the existence of criminal or other civil sanctions against the defendant. The application of those standards, the Court held, "imposes a sufficiently definite and meaningful constraint on the discretion of the fact-finder in awarding punitive damages."

Finally, but briefly, the Court considered the amount of the award—four times the compensatory award and 200 times the plaintiff's out-of-pocket expenses—noting that "[w]hile the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria." *Id.* at 1046.

The full impact of *Haslip* and its progeny is not yet clear. Although the Court found that the award under review did not violate due process, it did not purport to set any minimum requirements or standards for the establishment or review of punitive awards. It did, however, remand seven other cases then on its docket for reconsideration by lower courts in light of *Haslip*. *See Hospital Auth. v. Jones,* —— U.S. ——, 111 S.Ct. 1298, 113 L.Ed.2d 234 (1991); *Int'l Soc. of Krishna v. George,* —— U.S. ——, 111 S.Ct. 1299, 113 L.Ed.2d 234 (1991); *Church of Scientology v. Wollersheim,* —— U.S. ——, 111 S.Ct. 1298, 113 L.Ed.2d 234

(1991); *Clayton Brokerage Co. v. Jordan,* — U.S. —, 111 S.Ct. 1298, 113 L.Ed.2d 233 (1991); *Reserve Life Ins. Co. v. Eichenseer,* — U.S. —, 111 S.Ct. 1298, 113 L.Ed.2d 233 (1991); *Pacific Lighting Corp. v. MGW, Inc.,* — U.S. —, 111 S.Ct. 1299, 113 L.Ed.2d 235 (1991); and *Portec, Inc. v. The Post Office,* — U.S. —, 111 S.Ct. 1299, 113 L.Ed.2d 235 (1991).

As of the writing of this Opinion, further results in only one of those cases have been reported. In *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir.1991), the Court reconsidered but reaffirmed a $500,000 punitive damage award that supplemented a $1,000 compensatory damage award for refusal to pay a major medical insurance claim. In confirming the punitive award (500 times the compensatory award), the Court observed, at 1382, "[a]lthough Reserve Life did not maliciously mishandle Eichenseer's claim, it nonetheless acted with reckless disregard—if not intentional disregard—for the rights of its insured."

Other results under *Haslip* have varied. At least two courts have sustained punitive awards. In *Liberty Transport, Inc. v. Gorst,* 229 Cal.App.3d 417, 280 Cal.Rptr. 159 (1991), the California intermediate appellate court affirmed a $400,000 punitive award based on an $82,500 compensatory award for bad faith failure of an insurer to pay a property loss claim. Without much discussion, the Court held that "because of California's higher standard of proof by 'clear and convincing evidence' and objective criteria for determining the propriety and amount of an award, awards of punitive damages in this state have sufficient procedural safeguards to satisfy due process." *Id.* at 441, 280 Cal. Rptr. 159. Cited for that proposition was *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978), where the California Supreme Court confirmed its authority to review punitive damage awards and noted that, in conducting that review, it considered the nature of the defendant's acts in light of the whole record, the degree of reprehensibility, the amount of compensatory damages awarded, and the wealth of the defendant, all with the view

that the purpose of punitive awards is to punish wrong-doers and deter the commission of wrongful acts and that that purpose is not served by an award which, "in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." 582 P.2d at 990.

In *Wolf v. Goodyear Tire & Rubber Co.*, 808 S.W.2d 868 (Mo.App.1991), the court sustained a $250,000 punitive award based on a $49,500 compensatory award in a product liability action. The jury there, as in *Haslip*, was told that the purpose of punitive damages was to punish and deter and that it was to consider the evidence and determine the amount necessary to achieve those objectives. Moreover, under Missouri law, both the trial and appellate courts could review the amount of a punitive award "to determine the proper relationship between the degree of malice proved and the punitive damage award." *Id.* at 874. The appellate court, in particular, could review the jury's award under an abuse of discretion standard, to see if it was "so out of all proper proportion to the factors involved as to reveal improper motives or a clear abuse of the honest exercise of judgment." *Id.*, quoting from *Beggs v. Universal C.I.T. Credit Corporation*, 409 S.W.2d 719 (Mo. banc 1966). *See also Price v. Highland Community Bank*, 932 F.2d 601 (7th Cir.1991).

At least two appellate courts have reduced punitive awards on due process grounds. In *Republic Ins. Co. v. Hires*, 810 P.2d 790 (Nev.1991), the Nevada Supreme Court, exercising an assumed power of review, reduced from $22.5 million to $5 million a punitive award rendered against an insurer for refusing to pay a claim. The Court found that the defendant was guilty of "oppressive conduct," noted that the compensatory award was $410,000, and, though stating its reluctance to substitute its judgment for that of the jury, nonetheless declared that the amount awarded was "clearly disproportionate to the blameworthiness and harm-

fulness in the conduct of [the defendant] under the circumstances of this case." In *State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590 (Tex.App.1991), the Court found excessive a $15 million punitive award against an insurer for failure to pay a claim and ordered a new trial unless the plaintiff accepted a remittitur to $660,000. The compensatory damages in the case were $165,000.

Two other appellate courts have remanded punitive awards to the trial court for further consideration. In *American Employers Ins. v. Southern Seeding Serv.,* 931 F.2d 1453 (11th Cir.1991), an action against an insurer for bad faith in failing to settle a claim, the jury rendered a compensatory award for the insured of $400,000 and a punitive award of $750,000. Though tried in Federal court, Alabama law applied, and the Court found fault in the fact that, in denying post-trial motions without comment, the trial court did not comport with the Alabama requirement that the court reflect in the record its reasons for refusing to interfere with the award. In *Union Nat. Bank of Little Rock v. Mosbacher*, 933 F.2d 1440 (8th Cir.1991), the Court expressed concern as to whether the Arkansas procedure comported with *Haslip*. While noting that the Arkansas Supreme Court reviewed punitive damage awards to determine whether they shocked the Court's conscience or were so great as to be the product of passion or prejudice, it also observed that great leeway was given to the jury and that "Arkansas juries are apparently told little more than defendant's net worth and that punitive damages serve to punish and to deter." *Id.* [111 S.Ct.] at 1448. *See also Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 930 F.2d 1342 (8th Cir.1991), also involving the Arkansas procedure.

### D. *Maryland Standards and Constraints*

We turn now to see whether, and how, the Maryland law regarding punitive damages comports with the requirements implicit from *Haslip:* standards to guide the jury's

and the court's discretion; judicial review of jury verdicts; and the amount of the award.

### (1) Standards

■ Although the Court of Appeals has not, to our knowledge, promulgated a self-contained laundry list of standards, it has, in different cases, articulated principles that are similar to and serve the same purpose as the Alabama standards. It has made clear, for example, that punitive damages:

(1) may be imposed only where there is "outrageous conduct," *Nast v. Lockett,* 312 Md. 343, 349, 539 A.2d 1113 (1988), quoting from Black's Law Dictionary 352 (5th ed. 1979);

(2) may be awarded only upon a showing of "actual malice" on the part of the defendant, i.e., "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff" or, in certain kinds of cases, subject to further refinement by the Court of Appeals, "implied malice," i.e., "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others," *Schaefer v. Miller,* 322 Md. 297, 300, 587 A.2d 491 (1991); [11]

(3) "are to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct," *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531, 366 A.2d 7 (1976);

---

**11.** Whether, and in what form, a lesser standard than "actual malice" will continue to be recognized in actions founded on negligence or product liability or involving a contractual relationship is not clear. In *Schaefer v. Miller,* 322 Md. 297, 587 A.2d 491 (1991), three judges of the Court, in a concurring Opinion, urged that the distinctions raised in *H & R Block v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975) be abrogated, and in *Owens-Illinois, Inc. v. Zenobia,* S.T. 1991, No. 66, now pending, the Court specifically directed the parties to brief and argue what the correct standard for punitive damages should be in negligence and product liability cases. Because "actual malice" was the standard used in this case, we are not here concerned with whether a lesser standard may survive.

(4) "must relate to the degree of culpability exhibited by a particular defendant and that party's ability to pay," *Embrey v. Holly*, 293 Md. 128, 142, 442 A.2d 966 (1982);

(5) "represent a civil fine, and as such, should be imposed on an individual basis," *Id.;* and

(6) may be awarded only upon proof of actual loss and thus may *not* be awarded unless there is also an award of compensatory damages; *Shell Oil Co. v. Parker*, 265 Md. 631, 640, 291 A.2d 64 (1972); *Rite Aid Corp. v. Lake Shore Inv.*, 298 Md. 611, 626, 471 A.2d 735 (1984).

 Each of these principles has been fleshed out in the case law and each is a proper subject for jury instruction. Taken together, they suffice in our view to "reasonably accommodate [the defendant's] interest in rational decision-making and [the State's] interest in meaningful individualized assessment of appropriate deterrence and retribution." *Haslip*, 111 S.Ct. at 1044.

### (2) Judicial Review

As to the second element examined in *Haslip*, the circuit courts in Maryland have broad discretion to review jury verdicts for excessiveness. In *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988), the Court confirmed that:

"A trial judge, upon finding a verdict excessive, may order a new trial unless the plaintiff will agree to accept a lesser sum fixed by the court.... The standard to be applied by the trial judge in determining whether a new trial should be granted on the ground of excessiveness of the verdict had been variously stated as whether the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'"

In determining whether a punitive award is excessive to the point of directing a remission or a new trial in lieu thereof, the trial judge necessarily must apply the same principles, noted above, available to guide the jury. Essentially, this comes down to whether the award, by reason of

its amount, fails to serve its proper purpose. This discretionary review, tempered by those standards, "provides an additional check on the jury's ... discretion" and does measurably help to assure that the award does not exceed "an amount that will accomplish society's goals of punishment and deterrence." *Haslip,* 111 S.Ct. at 1045, quoting in part from *Green Oil Co. v. Hornsby,* 539 So.2d 218, 222 (Ala.1989).

The only significant difference between the Maryland procedure and that in Alabama is in the scope of appellate review of punitive awards. As a general rule in Maryland, "the question of whether a verdict is excessive is not open on appeal." *Continental Cas. Co. v. Mirabile,* 52 Md.App. 387, 399, 449 A.2d 1176 (1982). *See also D.C. Transit System v. Brooks,* 264 Md. 578, 588–90, 287 A.2d 251 (1972), and cases cited therein. There are exceptions to that rule, however. As stated in *State, Use of Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472 (1962) and noted again in *Banegura v. Taylor, supra,* 312 Md. at 624, 541 A.2d 969, although the granting or refusal of a remittitur is largely within the discretion of the trial court, "an abuse of that discretion may be reviewed by an appellate court 'under extraordinary circumstances.'"

In this regard, punitive awards are somewhat different than compensatory awards. Because there are special prerequisites for such awards, the appellate court may review the award to determine whether those prerequisites have been established, and, if not, the award may be vacated in its entirety. *See, for example, Food Fair Stores v. Hevey,* 275 Md. 50, 338 A.2d 43 (1975), *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 278 A.2d 12 (1971), *K & K Management v. Lee,* 316 Md. 137, 557 A.2d 965 (1989), *American Laundry Mach. v. Horan,* 45 Md.App. 97, 412 A.2d 407 (1980), and *Edmonds v. Murphy,* 83 Md.App. 133, 573 A.2d 853, *cert. granted,* 321 Md. 46, 580 A.2d 1066 (1990), vacating punitive damage awards because of an insufficient showing of the requisite malice; and *B & B Refrigeration v. Stander,* 263 Md. 577, 284 A.2d 244 (1971),

and *Shell Oil Co. v. Parker*, 265 Md. 631, 291 A.2d 64 (1972), vacating punitive damage awards because of an insufficient showing of actual loss or compensatory damages. *See also Heinze v. Murphy*, 180 Md. 423, 24 A.2d 917 (1942). Moreover, where the award was challenged in the trial court as excessive, the appellate court may examine whether the trial court "considered the claim of excessiveness on its merits," and, if not, remand for that purpose. *Banegura, supra*, 312 Md. at 624, 541 A.2d 969.

 To date, that has been about the limit of appellate review of punitive awards in Maryland. Notwithstanding the Supreme Court's view of the "traditional common-law approach" as embodying appellate review of punitive damage awards to "ensure that [they are] reasonable," *Haslip*, 111 S.Ct. at 1045, and either the exercise [12] or the announced assumption [13] of such authority by the appellate

---

**12.** *United Services Autom. Ass'n. v. Wade*, 544 So.2d 906 (Ala.1989); *Ramona Manor Convalescent Hospital v. Care Enterprises*, 177 Cal. App.3d 1120, 225 Cal.Rptr. 120 (1986); *Lassitter v. Intern. Union of Op. Engin.*, 349 So.2d 622 (Fla.1977); *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 365 S.E.2d 827 (1988); *Ford v. Guarantee Abstract & Title Co., Inc.*, 220 Kan. 244, 553 P.2d 254 (1976); *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826 (Minn.1988); *Republic Ins. Co. v. Hires*, 810 P.2d 790 (Nev.1991); *Stanton v. Gordon Jewelry Corp.*, 108 N.M. 160, 768 P.2d 888 (1989); *Chandler v. Denton*, 741 P.2d 855 (Okla. 1987); *Loope v. Goodings Million Dollar Midways, Inc.*, 553 S.W.2d 573 (Tenn.1977); *State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590 (Tex.App.1991); *VanDyke v. Mountain Coin Mach. Distrib.*, 758 P.2d 962 (Utah App.1988).

**13.** *Alaskan Village, Inc. v. Smalley*, 720 P.2d 945 (Alaska 1986); *Puz v. McDonald*, 140 Ariz. 77, 680 P.2d 213 (App.1984); *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187 (Colo.1984); *Riegel v. Aastad*, 272 A.2d 715 (Del.Super.1970); *Cloroben Chemical Corp. v. Comegys*, 464 A.2d 887 (Del.Super.1983); *Umphrey v. Sprinkel*, 106 Idaho 700, 682 P.2d 1247 (1983); *Zokoych v. Spalding*, 36 Ill.App.3d 654, 344 N.E.2d 805 (1976); *Tower Oil & Technology Co., Inc. v. Buckley*, 99 Ill.App.3d 637, 54 Ill.Dec. 843, 425 N.E.2d 1060 (1981); *Whittaker v. Dail*, 567 N.E.2d 816 (Ind.App.1991); *Chinigo v. Geismar Marine, Inc.*, 512 So.2d 487 (La.App.1987); *Wolf v. Goodyear Tire & Rubber Co.*, 808 S.W.2d 868 (Mo.App.1991); *Tindall v. Konitz Contracting, Inc.*, 240 Mont. 345, 783 P.2d 1376 (1989); *Nellis v. Miller*, 101 A.D.2d 1002, 477 N.Y.S.2d 72 (1984); *Stoner v. Nash Finch, Inc.*, 446 N.W.2d 747 (N.D.1989); *International Electronics Co. v. N.S.T. Metal Prod. Co.*, 370 Pa. 213, 88 A.2d

courts in many other States, there has been no case, to our knowledge, in which either this Court or the Court of Appeals has tampered with the amount of an award. But, in subjecting these awards to due process constraints and regarding the amount of the award as an important element in the due process matrix, the Supreme Court may well have made a wider degree of appellate review than heretofore practiced in Maryland necessary. If faced with a punitive award that was entered upon proper procedure but which nonetheless contravenes due process because it is out of all proportion to both the harm caused and the perniciousness of the conduct, we could not, on the ground of judicial impotence, allow the unconstitutional award to stand. It is on this very limited basis that we examine the award at issue.

### E. *Analysis*

This was, at bottom, a commercial dispute between two business competitors. The jury found, and rightly could find, that A & A acted improperly—that it engaged in conduct that exceeded the normal and allowable rules of competition and that, due to the overzealousness of one or more of its officials, was imbued with actual malice, a deliberate attempt to harm Evander. Evander was indeed harmed, to the extent of losing a commission in excess of $250,000, and the jury could properly conclude that A & A should be punished for engaging in such conduct and causing such loss. There was, in other words, an evidentiary basis for a punitive award.

The presentation of the issue to the jury became muddled, however, when (1) Evander failed to present evidence of A & A's net wealth and ability to pay, (2) A & A failed to

---

40 (1952); *Collins Music Co. v. Terry,* 400 S.E.2d 783 (S.C.App.1991); *Flockhart v. Wyant,* 467 N.W.2d 473 (S.D.1991); *Coty v. Ramsey Associates, Inc.,* 149 Vt. 451, 546 A.2d 196 (1988); *Philip Morris, Inc. v. Emerson,* 235 Va. 380, 368 S.E.2d 268 (1988); *Boeing Co. v. Sierracin Corp.,* 108 Wash.2d 38, 738 P.2d 665 (1987); *Fahrenberg v. Tengel,* 96 Wis.2d 211, 291 N.W.2d 516 (1980).

request the kind of instructions it now insists should have been given, and (3) the court failed to give *any* instruction on punitive damages with respect to A & A. The jury was never told the purpose of punitive damages; it had before it only the instruction, cast as to Shand and Mutual Fire, that actual malice was required and a definition of actual malice. The situation was not much improved in post-trial proceedings where, though complaining about the size of the award, A & A again omitted to offer any concrete standards but simply urged that the court either vacate the award entirely or reduce it to $5 million.

 On this record, we do not believe that a $12.5 million punitive award comports with due process. Although we cannot say with complete certainty that it is the largest punitive award rendered by a Maryland court, it is the largest, by far, of which we are aware. The nearest in amount was $7,500,000 rendered in *Potomac Electric v. Smith,* 79 Md.App. 591, 558 A.2d 768 (1989), and the nearest to that was $1,000,000, which we vacated in *Edmonds v. Murphy, supra,* 83 Md.App. 133, 573 A.2d 853. Most of the punitive awards to date have been well under $100,000; other than the award in *Potomac Electric,* the highest allowed to stand was $910,000 against Exxon Corporation in *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986).

Not only is the $12.5 million allowed by the court extraordinary in terms of Maryland history, it is far in excess of the actual harm caused to Evander, representing nearly fifty times the essentially liquidated compensatory damage. As we observed, until the very end of the case, Evander himself sought no more than $5 million. If the $840,000 awarded in *Haslip* came "close to the line" in terms of the actual loss suffered, this surely crosses that line.

Finally, it is evident that the conduct by A & A found opprobrious by the court and jury, though excessive, ill-motivated, and, in retrospect, stupid, does not strike us as very high on the scale of reprehensibility. Although we

carefully eschew any desire, or need, to engage in a proportionality review of punitive damage awards, we cannot help but note that the $7,500,000 damage awarded and sustained in *Potomac Electric v. Smith, supra,* 79 Md.App. 591, 558 A.2d 768, was based on the wanton conduct by an electric utility in allowing a high voltage wire to remain downed in an area frequented by children, resulting in the electrocution of a child, and that the $910,000 allowed to stand in *Exxon Corp. v. Yarema, supra,* 69 Md.App. 124, 516 A.2d 990, was based on the defendant's wantonly allowing at least 2,200 gallons of gasoline to leak from its underground tanks and pollute neighborhood wells, causing "substantial health and environmental damage." *Id.* at 164, 516 A.2d 990.

Nothing like that kind of harm occurred in this case. A & A did not endanger the public health or safety; its conduct was not life-threatening to anyone. We accept the conclusions reached below that it set out to cause economic harm to a competitor, that it used inappropriate means to achieve that goal, and that it should be punished for, and others should be deterred from, engaging in that conduct. But nothing approaching $12.5 million is necessary to achieve either goal.

■ Having reached the conclusion that there was an evidentiary basis for some award of punitive damages but that the award actually made does not comport with due process, we face the problem of what to do about it. Essentially, we have three choices: (1) assume an authority implicit from *Haslip* to modify the award ourselves and reduce it to what we regard as a proper amount, either directly or by ordering a new trial as to punitive damages in lieu of a remission by Evander; (2) vacate the award and remand it for reconsideration by the trial judge in the exercise of his authority to require a further remittitur; or (3) vacate the award and direct a new trial on that issue. We shall select the third option.

Although the occasion may arise where an appellate reduction may be the most appropriate solution, that option

is foreign to Maryland procedure and not one that we should select, absent clear direction from the Court of Appeals, where other, more traditional options exist. Nor is this a case for remand to the trial judge. He already gave the most careful attention to the matter and exercised his discretion as he thought best. Apart from these considerations, and what principally impels us to select the third option, is the fact that the jury itself was never given proper guidance in considering a punitive award. It is for the jury to determine the amount of damages; the role of judges is merely to assure that it has not exceeded the instructions given it or the supervening legal constraints placed on its discretion.

We shall therefore vacate the punitive damage award and remand for retrial the issue of whether A & A's conduct justifies an award of punitive damages and, if so, in what amount. The new jury should be instructed to assume as fact the findings made by the previous jury in response to Questions 1 through 9 on the Jury Verdict Form.[14] It should be instructed on the requirement of actual malice, the definition of actual malice, the purpose of punitive

---

**14.** On the Jury Verdict Form, the jury answered the following questions in the affirmative:

"1. Do you find that the defendants Shand, Morahan & Company, Inc. ('Shand') and Mutual Fire, Marine & Company, Inc. ('Mutual Fire') had a contract with plaintiff B. Dxon Evander & Associates, Inc. ('Evander') that entitled Evander to a commission on the tail?

2. Did Shand and Mutual Fire breach that contract with Evander?

4. Did Alexander & Alexander and Scheeler tortiously interfere with Evander's contract with Shand and Mutual Fire?

5. Do you find that as a direct and proximate result of the tortious interference by Alexander & Alexander and Scheeler, that Evander lost the commissions stated in no. 3?

6. Do you find that when Alexander & Alexander and Scheeler tortiously intefered with Evander's contract with Shand and Mutual Fire, Alexander & Alexander and Scheeler acted with actual malice?

7. Do you find that Alexander & Alexander and Scheeler, on the one hand, entered into a conspiracy with Shand and Mutual Fire, on the other, to deprive Evander of commissions due under his contract in the amount stated in No. 3?

damages, and the standards for determining whether and how much to award as set forth in the Maryland case law or otherwise required by *Haslip.* Because Evander has voluntarily given up its claim of punitive damages against Shand, we shall vacate that award without remand.

PUNITIVE DAMAGE AWARD AGAINST APPELLANT SHAND VACATED; PUNITIVE DAMAGE AWARD AGAINST APPELLANT A & A VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR NEW TRIAL AS TO PUNITIVE DAMAGES AGAINST A & A, IN ACCORDANCE WITH THIS OPINION; JUDGMENTS OTHERWISE AFFIRMED; COSTS TO BE PAID ONE-THIRD BY APPELLEE, ONE-THIRD BY APPELLANTS SHAND AND MUTUAL FIRE, AND ONE-THIRD BY APPELLANTS A & A AND SCHEELER.

8. Do you find that, as a direct and proximate result of the conspiracy Evander lost the commissions stated in No. 3?

9. Do you find that Alexander & Alexander and Scheeler and Shand and Mutual Fire acted with actual malice when they entered into the conspiracy to deprive Evander of the commissions in the amount stated in No. 3?"

Additionally, in its answer to question 3, the jury determined that "the precise commissions that Evander lost as a direct and proximate result of [the] breach was $250,052.82" and that Evander was entitled to interest on that amount starting from June 1, 1985.